Filed:  November 29, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

HOPE PRESBYTERIAN CHURCH
OF ROGUE RIVER, a domestic
nonprofit corporation,

Petitioner on Review,

v.

PRESBYTERIAN CHURCH (U.S.A)
and PRESBYTERY OF THE CASCADES,
a domestic nonprofit corporation,

Respondents on Review.

(CC 07-2707-E2; CA A139430; SC S059584)

On review from the Court of Appeals.*

Argued and submitted March 5, 2012, at Lewis and Clark Law School.

James Dole of Dole, Sorenson, Ransom & Ferguson, Grants Pass, argued the cause and filed the brief for petitioner on review.

Christopher J. Cox of Weil, Gotshal & Manges LLP, Redwood Shores, California, argued the cause for respondents on review.  James A. Wallan of Hornecker, Cowling, Hassen & Heysell, LLP, Medford, and Yen P. Nguyen of Weil, Gotshal & Manges LLP filed the brief.

W. Michael Gillette of Schwabe, Williamson & Wyatt P.C., Portland, argued the cause and filed the brief for *amicus curiae* Presbyterian Lay Committee.  With him on the brief were Jill S. Gelineau and Sara Kobak of Schwabe, Williamson & Wyatt P.C. and Forrest A. Norman of Gallagher Sharp, Cleveland, Ohio.

Paul A. Dakopolos and Joan W. Reese of Garrett Hemann Robertson P.C., Salem, filed the brief for *amicus curiae* Episcopal Diocese of Oregon.

Before Balmer, Chief Justice, and Durham, De Muniz, Kistler, Walters, and Linder, Justices.**

BALMER, C. J.

The decision of the Court of Appeals is affirmed.  The judgment of the circuit court is reversed, and the case is remanded to the circuit court for entry of a judgment in favor of Presbyterian Church (U.S.A.).

*Appeal from Jackson County Circuit Court, G. Philip Arnold, Judge. 242 Or App 485, 255 P3d 645 (2011).

**Landau, J., did not participate in the consideration or decision of this case.

BALMER, C. J.

This case requires us to decide whether a local church or the national church from which it seeks to separate owns certain church property. Hope Presbyterian Church of Rogue River (Hope Presbyterian) is the name of a church congregation and a related nonprofit corporation. The congregation has been affiliated with a national Presbyterian Church organization since its founding in 1901, most recently affiliating with the Presbyterian Church (U.S.A.) (PCUSA), and its regional presbytery, the Presbytery of the Cascades. In 2007, the congregation voted to disaffiliate from PCUSA. The corporation then initiated this lawsuit, seeking to quiet title to certain church property and to obtain a declaration that PCUSA and the Presbytery of the Cascades have no claim or interest in any of the real and personal property in Hope Presbyterian's possession. On cross-motions for summary judgment, the trial court quieted title in favor of Hope Presbyterian and declared that PCUSA and the Presbytery of the Cascades had no beneficial interest in any of Hope Presbyterian's property. The Court of Appeals reversed, holding that Hope Presbyterian held the property in trust for PCUSA. *Hope Presbyterian v. Presbyterian Church (USA)*, 242 Or App 485, 255 P3d 645 (2011). For the reasons that follow, we affirm the decision of the Court of Appeals.

## FACTS

The Court of Appeals described in detail the relevant history of both Hope

1

Presbyterian, the local congregation,[1] and PCUSA, the national denomination. We take the facts necessary to our decision from the Court of Appeals' opinion and the summary judgment record. Hope Presbyterian was established as a congregation in 1901 and was affiliated with predecessor organizations to PCUSA from that time until 1983, when it began over 20 years of affiliation with PCUSA. In 1930, Hope Presbyterian formally incorporated as "Hope Presbyterian Church of Rogue River." In the 1950s, Hope Presbyterian moved to its current location in Rogue River and began to use property that is now disputed. The Trustees of the Presbytery of Southwest Oregon, the regional presbytery of which Hope Presbyterian was a part at the time -- and which was, in turn, a part of a predecessor to PCUSA -- had acquired legal title to the property in 1955. In 1961, the Trustees of the Presbytery of Southwest Oregon transferred title to "The Hope Community Presbyterian Church, Rogue River, Ore[.]" by warranty deed. The deed makes no reference to the property being held in trust for PCUSA or its predecessor. Hope Presbyterian acquired an additional parcel of real property from a third party in 2001 by warranty deed. As with the first deed, the deed to the property acquired in 2001 makes no reference to PCUSA or to the property being held in trust. PCUSA does not dispute that Hope Presbyterian holds legal title to the property at issue.

---

[1] Hope Presbyterian argues that the acts of the congregation could not bind the corporate entity, which is the plaintiff in this lawsuit, because the congregation and the corporation are distinct entities. As explained below, we conclude that, for purposes of this case, the actions of both the congregation and the corporation are relevant and often overlap. Therefore, we distinguish between the congregation and the corporation only where necessary.

2

PCUSA is the largest Presbyterian denomination in the United States and was formed in 1983 when the Presbyterian Church in the United States and the United Presbyterian Church in the United States of America (UPCUSA) merged. Similarly to its predecessors, PCUSA is organized hierarchically, with an individual local church being governed in ascending order by the "session," composed of leaders from the local church; the regional "presbytery," which oversees local churches in the same geographical area; the "synod," which oversees presbyteries within a geographic region; and ultimately, by the "General Assembly," the national governing body.

*The Book of Confessions* and the *Book of Order* are the governing documents that form the constitution of PCUSA. The *Book of Order* addresses, among other topics, how real and personal property are held within the organization. Chapter VIII, section G-8.0201, of the *Book of Order* provides:

"All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)."

That provision of the *Book of Order* is almost identical to a provision in the constitution of one of PCUSA's predecessors, UPCUSA, with which Hope Presbyterian was affiliated before joining PCUSA. UPCUSA had amended its constitution in 1981 to include an express trust provision, and the Presbytery of the Cascades, which Hope Presbyterian belonged to at the time, was one of the presbyteries that approved that amendment.

When PCUSA was formed in 1983, two members of Hope Presbyterian

3

were present at the meeting approving the merger of UPCUSA with another Presbyterian denomination and adopting the PCUSA *Book of Order*, which included the express trust provision. Soon after the merger, Hope Presbyterian amended the congregation's bylaws to state:

> "This church being a part of the Presbytery of the Cascades, the Synod of the Pacific, and the Presbyterian Church, U.S.A., is governed in all its provisions by the Constitution of the Presbyterian Church, U.S.A."

(Underscoring in original.) Around the same time as that amendment to the congregation's bylaws, the president and secretary of the corporation, as well as a third person, signed an amendment to the articles of incorporation of "Hope 'Community' or 'United' Presbyterian Church." The document states:

> "This corporation is a church congregation of and holds all property as trustee for the Presbyterian Church (U.S.A.)."

The amendment was approved at a congregational meeting on October 23, 1983, and at a meeting of the board of trustees on November 1, 1983. The amendment, however, was never filed with the Secretary of State.

In 2007, the members of Hope Presbyterian's congregation voted to disaffiliate from PCUSA. The *Book of Order* places the presbytery in control of the disaffiliation process: "The relationship to the Presbyterian Church (U.S.A.) of a particular church can be severed only by constitutional action on the part of the presbytery. (G-11.0103i)[.]" *Book of Order* § G-8.0601 (2007). In fact, the *Book of Order* lists the disaffiliation process, and actions involving real property, as part of the presbytery's key responsibilities:

4

"The presbytery is responsible for the mission and government of the church throughout its geographical district. It therefore has the responsibility and power

"* * * * *

"i.    to divide, dismiss, or dissolve churches in consultation with their members; [and]

"* * * * *

"y.    to consider and act upon requests from congregations for permission to take the actions regarding real property as described in G-8.0000[.]"

*Id.* § G-11.0103. In accordance with those provisions of the *Book of Order*, members of Hope Presbyterian met with representatives from the Presbytery of the Cascades regarding disaffiliation. Before the presbytery's disaffiliation process was complete, however, Hope Presbyterian brought this action to determine the ownership of the real and personal property in its possession, seeking to quiet title in its favor and to obtain a declaratory judgment that it is the sole owner of all real and personal property in its possession.

The Court of Appeals summarized the proceedings in the trial court:

"Both sides moved for summary judgment. Defendants asserted that, under the First Amendment to the United States Constitution, civil courts are authorized to resolve disputes between churches and their denominations only in limited circumstances. According to defendants, long-standing United States Supreme Court case law -- coincidentally, involving the Presbyterian Church -- requires civil courts to defer to the determinations of the highest governing body of 'hierarchical' churches. In this case, defendants contended, because the PCUSA clearly is such a hierarchical church, this dispute is conclusively resolved by reference to the *Book of Order*, which unambiguously provides that all property is held in trust for the denomination. In response, Hope Presbyterian argued that the PCUSA is not actually 'hierarchical' in nature and so is not subject to the analysis for which defendants contended. In any event, it argued, under

5

more recent case law, the preferred approach is to resolve disputes under 'neutral principles' of law, without regard to evidence relating to church doctrine or polity. Under those neutral principles, Hope Presbyterian argued, its title to the property in dispute is conclusive, as there is no evidence that a trust was created in accordance with the requirements of Oregon trust law.

"The trial court sided with Hope Presbyterian. The court explained that the case should be resolved on the basis of 'neutral secular principles' of law. The court then said:

"'My way of understanding the neutral secular principles doctrine is that this Court must look at legal documents and must disregard purely church documents such as the Constitution of the Presbyterian Church (USA), statements of ecclesiastical doctrine and church polity, and the Book of Order. That means this court's analysis of this civil dispute about ownership of property, in this civil law court, is based entirely upon legal documents such as deeds and any trust documents that have been appropriately executed according to Oregon law.'

"The trial court did not consider the *Book of Order* or Hope Presbyterian's amended articles of incorporation, both of which declare that the disputed property is held in trust for the PCUSA. Instead, the court based its decision exclusively on any documents of conveyance or title that the parties submitted to the court. Finding no documents of written conveyance to the PCUSA or any other evidence of a trust, the court concluded that Hope Presbyterian's title in the property was conclusive."

242 Or App at 492-93.

The Court of Appeals reversed. The court traced the United States Supreme Court's approach to church property disputes, in light of the provision of the First Amendment to the United States Constitution, which states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" We discuss that case law in detail below, but for present purposes it is sufficient to note that the Supreme Court has stated that states may adopt any one of

6

various approaches to resolving church property disputes, as long as the approach involves no consideration of doctrinal matters, and the Court expressly has approved two general approaches. In *Watson v. Jones*, 80 US 679, 20 L Ed 666 (1871), the Supreme Court adopted what is commonly known as the "hierarchical deference" approach. Under that approach, in disputes arising in churches with a hierarchical structure,

> "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

*Id*. at 727. In contrast, when considering disputes arising in independent congregations, rather than hierarchically organized churches, the "hierarchical deference" approach applies "the ordinary principles which govern voluntary associations[,]" including the church's "principle[s] of government[,]" and upholds the actions of "congregation[al] officers * * * who adhere to the acknowledged organism by which the body is governed * * *." *Id.* at 725. The Court also has held that states may adopt the "neutral principles" approach described in *Jones v. Wolf*, 443 US 595, 604, 99 S Ct 3020, 61 L Ed 2d 775 (1979). Under that approach, courts resolve church property disputes by examining "the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property" in the context of generally applicable neutral principles of law, such as trust and property law. *Id.* at 603.

After discussing the hierarchical deference and neutral principles of law approaches to resolving church property disputes, the Court of Appeals addressed the few

7

Oregon cases that have grappled with the issue. In *Presbytery of Willamette v. Hammer*, 235 Or 564, 385 P2d 1013 (1963), a case also involving the Presbyterian Church, after a local congregation had dissolved, a regional presbytery sought to quiet title to property to which the local church held legal title. In affirming the trial court's decision to quiet title in the presbytery's favor, the court did not refer to *Watson* or hierarchical deference. The court did, however, cite cases from other states that relied specifically on *Watson* or generally on a theory of hierarchical deference in similar situations. More importantly, the court relied on evidence that "under the constitution of the United Presbyterian Church[,] when a member church is dissolved the property falls under the control of the Presbytery" and that, within the Presbyterian form of church governance, the presbyteries "'hold ultimate title to all of the properties.'" *Id.* at 568-69 (quoting testimony of secretary-treasurer of plaintiff presbytery). In determining whether the presbytery held title to the property, the court did not rely on documents or evidence that would create a trust in circumstances not involving a church.

In describing *Presbytery of Willamette*, the Court of Appeals in this case stated:

> "[T]he Oregon Supreme Court resolved a church property dispute by deferring to the provisions of the national Presbyterian Church constitution, supported by citations of authority to cases expressly invoking the hierarchical-deference approach that the United States Supreme Court required for so long under *Watson*."

*Hope Presbyterian*, 242 Or App at 509. Because no subsequent Oregon Supreme Court decisions suggested that the court had adopted any rule other than hierarchical deference, the Court of Appeals applied that methodology to resolve the parties' property dispute.

8

After determining that PCUSA is a hierarchical church, the Court of Appeals looked to the declaration in the *Book of Order* that all property held by a local church is held in trust for PCUSA. The court also noted that Hope Presbyterian's bylaws stated that the local church was governed by PCUSA's constitution, which includes the *Book of Order*. Because one of PCUSA's governing documents declared the existence of a trust in PCUSA's favor, following *Presbytery of Willamette*, the court deferred to PCUSA's imposition of a trust over Hope Presbyterian's property. *Id.* at 509-10.

The Court of Appeals went on, however, to analyze the dispute under the neutral principles approach as well -- having noted earlier that, following *Jones*, 443 US 595, the trend in the case law seemed to be toward that approach -- and concluded that PCUSA prevailed under that approach as well. *Id.* at 504, 512-14. Examining neutral principles of Oregon trust law, the court noted that, "[u]nder ORS 130.150(1)(b), a trust to titled property may be created '[b]y declaration by the owner of property that the owner holds identifiable property as trustee.'" *Id.* at 513 (alteration in *Hope Presbyterian*). The court then concluded that evidence in the summary judgment record demonstrated that Hope Presbyterian intended to create a trust over the property in its possession for the benefit of PCUSA. That evidence included the *Book of Order*, which declared an express trust in favor of PCUSA; the bylaws of the congregation of Hope Presbyterian, which declared that the congregation was governed by the PCUSA constitution; and Hope Presbyterian's declaration in the Articles of Amendment that, "[t]his corporation is a church congregation of and holds all property as trustee" for PCUSA. *Id.* at 514. For those reasons the Court of Appeals reversed and remanded the case for entry of a

9

judgment declaring the property to be held in trust for PCUSA.

On review, Hope Presbyterian contends that the Court of Appeals erred in holding that Oregon follows the hierarchical deference approach rather than the neutral principles of law approach.[2] Under the neutral principles approach, Hope Presbyterian argues, no trust was created as matter of law and, if a trust had been created, the congregation's decision to disaffiliate from PCUSA would have revoked that trust. *Amicus curiae* Presbyterian Lay Committee supports Hope Presbyterian, arguing that Oregon should adopt the neutral principles approach for resolving church property disputes.

PCUSA responds that the Court of Appeals was correct to apply hierarchical deference and resolve the property dispute in PCUSA's favor. PCUSA also asserts that it should prevail even if this court adopts the neutral principles approach because, it argues, under the Supreme Court's decision in *Jones*, an express trust provision in the denominational church's constitution is dispositive, and PCUSA's constitution contains an express trust provision. *Amicus curiae* Episcopal Diocese of Oregon filed a brief in support of PCUSA, arguing that hierarchical deference is the

---

[2]     The parties -- and other courts -- generally identify the two approaches discussed in the text as the "hierarchical deference" approach and the "neutral principles" approach. We do so as well. As our discussion below of decisions from other states demonstrates, however, notwithstanding the nomenclature, states actually apply a variety of approaches, some of which are more deferential to church governance decisions and some of which focus more on generally applicable principles of state property, contract, and trust law.

10

appropriate approach to resolving church property disputes. Episcopal Diocese of Oregon also argues that, even if the neutral principles approach is adopted, PCUSA should prevail because the express trust clause in PCUSA's constitution, to which Episcopal Diocese of Oregon contends that Hope Presbyterian subscribed through its conduct, shows the parties' intent to create a trust as required by *Jones*.

FIRST AMENDMENT PRINCIPLES IN CHURCH PROPERTY DISPUTES

The First Amendment to the United States Constitution provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" The First Amendment is applicable to the states through the Fourteenth Amendment. The limitations imposed by the religion clauses of the First Amendment "'severely circumscribe[] the role that civil courts may play in resolving church property disputes'" and "prohibit[] civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Jones*, 443 US at 602 (quoting *Presbyterian Church v. Hull Church*, 393 US 440, 449, 89 S Ct 601, 21 L Ed 2d 658 (1969)).

The United States Supreme Court first dealt with how to resolve church property disputes in *Watson*, 80 US 679. In that case, certain members of a local congregation of the Presbyterian Church split from the denominational church over the issue of slavery, with the dissenting members opposing the emancipation of slaves and the denominational church supporting emancipation. The dissenting members, however, wished to continue to possess and use the local church's property. The General Assembly, the governing body of the denominational church, declared that intermediate

11

governing bodies, such as synods and presbyteries, that shared the dissenting faction's beliefs had departed from the faith and asserted that those who adhered to the General Assembly's beliefs were the true and lawful bodies of the church.

The Supreme Court in *Watson* began by stating:

"Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints."

80 US at 714.

The Supreme Court then classified religious organizations as being either organized around independent congregations or organized hierarchically. The Court described the different approaches for resolving congregational and hierarchical disputes. For independent congregations, the rights of competing factions to use and possess church property "must be determined by the ordinary principles which govern voluntary associations." *Id*. at 725. For hierarchical churches, however, the Court stated that it was "bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." *Id*. at 726-27. In hierarchical churches, like the Presbyterian Church, the Court rejected the notion that civil courts could second-guess the resolution of internal disputes by the governing church body. The Court stated:

"All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular

12

courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

*Id*. at 729.

To resolve property disputes within hierarchical churches, the Supreme Court held that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id*. at 727. In that case, the Court concluded that the Presbyterian Church was a hierarchical church, and, as noted, the General Assembly -- the highest governing body of the Presbyterian Church -- had declared that the dissenting members of the local church were no longer operating according to church doctrine. The Court deferred to that declaration and thus determined that the dissenting members had no claim to church property.

For more than 100 years, so-called "hierarchical deference" was the only methodology that the Supreme Court endorsed under the First Amendment to resolve property disputes arising out of a schism in a hierarchically organized denomination. In *Jones v. Wolf*, however, the Court held that a state may adopt "'*any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" 443 US at 602 (quoting *Md. & Va. Churches v. Sharpsburg Ch.*, 396 US 367, 368, 90 S Ct 499, 24 L Ed 2d 582 (1970) (Brennan, J., concurring)) (emphasis in *Md. & Va.*

13

*Churches*).  Like *Watson*, *Jones* involved a schism within a Presbyterian denomination. The Georgia Supreme Court resolved the property dispute by applying "neutral principles of law" rather than deferring to the decision of the denominational church.  *Id.* at 599. The United States Supreme Court endorsed the Georgia Supreme Court's adoption of the "neutral principles" approach to resolving church property disputes as one constitutionally acceptable alternative to the hierarchical deference approach.  *Id.* at 604.

In applying the neutral principles approach, a court resolves church property disputes by relying on "objective, well-established concepts of trust and property law familiar to lawyers and judges," rather than automatically deferring to all decisions of the governing body of a hierarchical church.  *Id.* at 603.  To determine the ownership of church property, courts may examine "the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property."  *Id.*  In addition to state statutes governing the holding of church property, courts may also examine other relevant state statutes.  *See id.* at 600 (citing neutral principles cases where the Georgia Supreme Court considered state statutes dealing with implied trusts).  In examining church documents, however, courts "must take special care to scrutinize the document[s] in purely secular terms" and thereby avoid "entanglement in questions of religious doctrine, polity, and practice."  *Id*. at 603-04.  The Court nevertheless recognized that there might be circumstances in which "the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property."  *Id.* at 604.  In

14

those circumstances, if the interpretation of the documents would "require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.*

The dissent in *Jones* criticized the majority for failing to defer to church tribunals regarding the ownership of disputed property. The dissent argued that deference to the decision of the hierarchical church ensured that religious freedom was protected from government interference. *Id*. at 616-17 (Powell, J., dissenting). The majority responded,

> "At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form."

*Id*. at 606. State courts have focused on that statement in *Jones* when applying the neutral principles approach.

State courts faced with church property disputes are left with the Supreme Court's holding in *Jones* that, under the First Amendment, states may resolve church property disputes using any approach that does not involve consideration of doctrinal matters. As noted, without foreclosing other approaches, the Court expressly has approved both the hierarchical deference approach, which involves deference to the judgment of the governing body of a hierarchical church, and the neutral principles approach, which involves applying neutral principles of law to determine ownership, as

15

long as any church documents are analyzed in a secular manner.

Just as the federal constitution does not mandate application of a particular approach to resolving church property disputes, neither party argues that the Oregon Constitution requires the application of the hierarchical deference approach, the neutral principles approach, or any other approach; neither do the parties argue that the Oregon Constitution prohibits any particular approach. Instead, the parties focus their arguments on this court's prior case law involving church property disputes.

As noted, the Court of Appeals relied on *Presbytery of Willamette*, 235 Or 564, to hold that Oregon follows the hierarchical deference approach, and, on review, the parties expend considerable energy debating whether *Presbytery of Willamette* and subsequent cases mandate applying hierarchical deference in this case. We need not decide whether *Presbytery of Willamette* adopted hierarchical deference or whether the methodology used in that case is binding on us now. When *Presbytery of Willamette* was decided, hierarchical deference, as described in the Supreme Court's *Watson* decision, was the only permissible approach under the First Amendment for resolving church property disputes within hierarchical churches. When the Court in *Jones* later authorized states to choose any approach, including the neutral principles approach, that did not consider doctrinal matters -- more than a decade after this court decided *Presbytery of Willamette* -- it created a new legal context for evaluating church property disputes under the First Amendment. That change in the legal context reduces the significance of *Presbytery of Willamette* and provides ample reason for this court to reexamine the proper methodology for resolving church property disputes in Oregon. *See Farmers Ins.*

16

*Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011) ("[T]his court is willing to reconsider cases when the legal or factual context has changed in such a way as to seriously undermine the reasoning or result of earlier cases.").

Although courts must decide, when presented, property disputes (and other civil law matters) in which churches or other religious organizations are parties, First Amendment principles require that they do so without becoming involved in matters of church doctrine. Because both the hierarchical deference approach articulated in *Watson* and the neutral principles approach described in *Jones* defer to church decisions on matters of doctrine, thereby avoiding entangling courts in doctrinal disputes, we conclude that either approach is permissible in this case, which involves a property dispute within a hierarchical church. In *Jones,* the Supreme Court -- while not overruling *Watson* -- suggested that the neutral principles approach might be preferable to hierarchical deference:

"The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice."

443 US at 603.

We agree that the neutral principles approach has advantages over the hierarchical deference approach, even though the neutral principles approach does not free the courts from examining and potentially giving legal effect to church documents. We think that "[o]n balance * * * the promise of nonentanglement and neutrality inherent

17

in the neutral-principles approach more than compensates for what will be occasional problems in application." *Id.* at 604. To avoid those occasional problems, the Supreme Court in *Jones* emphasized that civil courts "must take special care to scrutinize the [church] document[s] in purely secular terms, and not to rely on religious precepts in determining whether the document[s] indicate[] that the parties have intended to create a trust." *Id.* At the same time, if the interpretation of church documents would involve the court in resolving a doctrinal controversy, then the court must defer to the resolution of that doctrinal issue by the church's governing authority. *Id.* In that way, courts can give effect to the relevant church documents, while avoiding prohibited religious entanglement. For those reasons, we apply here the neutral principles approach for resolving church property disputes.[3]

APPLICATION OF NEUTRAL PRINCIPLES

Since *Jones* opened the door for states to apply neutral principles of law to resolve church property disputes under the First Amendment, hierarchical churches have been on notice that state courts no longer are required to defer to the denominational church's decision in a property dispute. Instead, under the neutral principles approach, courts may examine deeds, local church charters, state statutes, and the denominational church's constitution. *Jones*, 443 US at 600, 603. Moreover, as *Jones* stated, any time

---

[3]      We note that the majority of states that have examined the issue of church property disputes since *Jones* have adopted the neutral principles approach. *See, e.g.*, *In re Episcopal Church Cases*, 45 Cal 4th 467, 485, 198 P3d 66, 79, *cert den*, __US __, 130 S Ct 179 (2009); *Presbytery of Ohio Valley v. OPC*, 973 NE2d 1099, 1107 (Ind 2012).

18

before a dispute occurs, the parties can express their intent regarding the disposition of property. *Id.* at 606. A hierarchical church can ensure that property will remain with the faction loyal to the denominational church by modifying "the deeds or the corporate charter to include a right of reversion or trust in favor of the general church." *Id.* Alternatively, the constitution of the denominational church can be made "to recite an express trust in favor of the denominational church[,]" *id.*, as PCUSA's constitution did when it was adopted in 1983 after *Jones*. Civil courts are bound to recognize the existence of a trust in the denominational church's favor, "provided it is embodied in some legally cognizable form." *Id.*

Although *Jones* provides a general framework for the neutral principles approach, state courts have applied that approach in different ways. Most courts examine the documents listed in *Jones*, including the denominational church's constitution. As the Court of Appeals noted, courts rarely deem the denominational church's constitution irrelevant and disregard it, as the trial court did in this case. *Hope Presbyterian*, 242 Or App at 504-05. Courts have disagreed, however, over the legal implications of an express trust provision in the denominational church's constitution.

Some courts have found an express trust provision in the denominational church's constitution dispositive and have ruled in favor of the denominational church, even in the absence of other supporting documents. *See, e.g.*, *Episcopal Diocese of Rochester v. Harnish*, 11 NY3d 340, 351, 899 NE2d 920, 924-25 (2008) (finding express trust provision in denominational church constitution dispositive after finding no support for creation of a trust in deeds, certificate of incorporation, or state law). A few courts

19

have analyzed the denominational church's constitution under principles of state law and found an express trust clause to have little meaning. *See, e.g.*, *All Saints Parish Waccamaw v. Protestant Episcopal Church in Diocese of South Carolina*, 385 SC 428, 449, 685 SE2d 163, 174 (2009), *cert dismissed*, __ US __, 130 S Ct 2088 (2010) (finding express trust provision in church constitution could not have created a trust over the local church's property because, without legal title to the property, denominational church could not declare that the property was held in trust). Many courts, however, have examined the denominational church's constitution -- in some cases giving weight to the local church's assent to that constitution -- along with deeds, local church charters, and state statutes, to determine the outcome under neutral principles of law. *See, e.g.*, *In re Episcopal Church Cases*, 45 Cal 4th 467, 489, 493, 198 P3d 66, 81-82, 84 (2009) (ruling in favor of denominational church after examining deeds, local church's corporate documents, state statutes governing religious property, and denominational church constitution, giving particular weight to the fact that the local church "agreed from the beginning of its existence to be part of a greater denominational church and to be bound by that greater church's governing instruments"). Thus, state courts, even those applying "neutral principles," have not adopted a uniform approach for interpreting express trust provisions in denominational church constitutions.

Here, PCUSA contends that the recitation of an express trust in favor of the denominational church, as contained in the *Book of Order*, necessarily creates an express trust under the neutral principles approach, regardless of the existence of documents from the local church indicating any intent to create such a trust. PCUSA claims that *Jones*

requires that result. In addition to relying on the statement in *Jones* that "the constitution of the general church can be made to recite an express trust in favor of the denominational church[,]" PCUSA relies on the Supreme Court's statement that "[t]he burden involved in taking such steps will be minimal." 443 US at 606. PCUSA argues that, if it is required to comply with the trust laws of all 50 states where it has congregations, rather than merely amending its constitution, it will face an "enormous burden" and not a minimal one. Therefore, PCUSA argues, in light of *Jones*, the trust was created when it adopted its constitution containing the express trust clause.

In our view, however, the express trust provision in PCUSA's constitution cannot be dispositive, because *Jones* went on to state that the denominational church may ensure that church property remains with the loyal faction by reciting an express trust, "provided it is embodied in some legally cognizable form." *Id*. Whatever the exact contours of the phrase "legally cognizable," because there is no federal law governing the creation of trusts, that phrase must include at least the trust laws of the 50 states. In fact, one of the primary advantages of the neutral principles approach, according to *Jones*, is that "[t]he method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." *Id.* at 603. Moreover, looking to only the church constitution, as PCUSA argues we should do, would detract from the advantages of the neutral principles approach and essentially would be a *de facto* application of hierarchical deference. *See Presbytery of Ohio Valley v. OPC*, 973 NE2d 1099, 1106 n 7 (Ind 2012) (stating that a rule requiring imposition of a trust based solely on a trust provision in the church constitution "would result in *de facto* compulsory deference").

21

Thus, under the neutral principles approach, the denominational church may ensure that property remains with the loyal faction in the event of a schism by reciting an express trust in its favor, *provided* that the recitation is embodied in a legally cognizable form in the state where the controversy arose. Here, as discussed, PCUSA's constitution declares an express trust in favor of the denominational church for property, the legal title to which is in the name of the local church.

We now turn to the principles of Oregon trust law and the facts of this case to determine whether a trust exists over Hope Presbyterian's property in favor of PCUSA under Oregon law. Oregon adopted the Uniform Trust Code in 2005, and it provides a nonexclusive list of ways to create an express trust.[4] *See* ORS 130.150; *The Oregon Uniform Trust Code and Comments*, 42 Willamette L Rev 187, 246 (2006) [hereinafter *Oregon UTC & Comments*] (noting list of methods for creating a trust is not exclusive). Although Hope Presbyterian holds legal title to the property at issue, "[a] trust may be created * * * [b]y declaration by the owner of property that the owner holds identifiable property as trustee[.]" ORS 130.150(1)(b). When an "'owner of property declares himself trustee of the property, a trust may be created without a transfer of title to the property.'" *Winters v. Winters*, 165 Or 659, 667, 109 P2d 857 (1941) (quoting 1

---

[4] Although PCUSA argues that it formerly had an interest in local church property under a theory of implied trust, it argues the present case under a theory of express trust pursuant to *Jones*. We do not address whether an implied trust arose in this case.

*Restatement of the Law of Trusts* § 17 comment a (1935)).[5] Although a transfer of title is not required to create a trust by declaration, the statutory requirements for creating a trust must be satisfied: (1) the settlor must have capacity to create a trust; (2) the settlor must indicate an intention to create the trust; (3) the trust must have a definite beneficiary; (4) the trustee must have duties to perform; and (5) the same person cannot be the sole trustee and the sole beneficiary. ORS 130.155(1). Here, the focus of the parties' dispute is on the second element: whether the intent requirement was met.

The first issue, then, is whether Hope Presbyterian, as the owner of the property, declared that it held the property as trustee for PCUSA. The second issue is whether Hope Presbyterian subsequently revoked that purported trust.

PCUSA asserts that two documents approved by Hope Presbyterian shortly after the 1983 adoption of the *Book of Order* demonstrate Hope Presbyterian's intent to create a trust over church property for PCUSA's benefit. In apparent response to *Jones*, PCUSA declared in the *Book of Order*:

> "All property held by or for a particular church, * * * whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)."

---

[5]     We cite to both the statutes and Oregon case law on trusts because, although Oregon has adopted the Uniform Trust Code, the common law remains relevant: "The common law of trusts and principles of equity supplement this chapter [ORS chapter 130], except to the extent modified by this chapter or other law." ORS 130.025.

After PCUSA adopted that express trust provision, Hope Presbyterian, as previously stated, amended the congregation's bylaws to state:

> "This church being a part of the Presbytery of the Cascades, the Synod of the Pacific, and the Presbyterian Church, U.S.A., is governed in all its provisions by the Constitution of the Presbyterian Church, U.S.A."

(Underscoring in original.) In addition, members of Hope Presbyterian and the board of trustees for the church corporation approved an amendment to the articles of incorporation declaring:

> "This corporation is a church congregation of and holds all property as trustee for the Presbyterian Church (U.S.A.)."

The amendment was signed by the corporation's president and secretary, as well as a third party, under the statement, "We, the undersigned, declare under penalties of perjury that we have examined the foregoing and to the best of our knowledge and belief, it is true, correct and complete." As noted, that document was never filed with the Secretary of State.

Hope Presbyterian argues that what appears to be an expression of intent by the congregation and the corporation to "hold[] all property as trustee" for PCUSA was not, in fact, sufficient to create a trust because that intent was expressed at most by the congregation. It maintains that the congregation is a separate entity that cannot bind the corporation and that the corporation holds legal title to the property. Hope Presbyterian also argues that, even if there is no meaningful distinction between the entities, the Articles of Amendment, which declare the trust, contain numerous defects, including that they were never filed with the Secretary of State. Moreover, Hope Presbyterian asserts

24

that the purported trust fails to satisfy the statute of frauds.

We begin by addressing Hope Presbyterian's argument that the congregation is a separate entity that cannot bind the corporation because some of the acts that may be indicative of intent to create a trust were taken by members of the congregation. Hope Presbyterian focuses on the corporation's status as the plaintiff in this case, and as the holder of legal title to the property, and notes its lack of ties to PCUSA. Although the corporation was "affiliated" with PCUSA, Hope Presbyterian argues, the corporation could not have been a "member" of PCUSA because corporations cannot be members of PCUSA. Because it was not a member, Hope Presbyterian argues that the corporation was never bound by the *Book of Order* and, in fact, was never required to remain affiliated with any Presbyterian denomination.

PCUSA responds that the corporation and the congregation are intertwined. The *Book of Order* contemplates formation of a corporation and extends the express trust provision to property where the "legal title is lodged in a corporation[.]" § G-8.0201. In addition, PCUSA notes that the congregation's bylaws state that church members are entitled to vote on matters affecting corporate affairs and that the board of trustees, which "fulfill[s] the requirements of civil law with respect to the church corporation," must consist of church elders and be approved at a congregational meeting.

We agree that, for purposes of creation of the trust, there is no meaningful distinction between the nonprofit corporation, Hope Presbyterian Church of Rogue River, and the church congregation of the same name. The congregation existed for nearly 30 years before the members created the corporation, and the record makes it plain that the

25

corporation was created to help the congregation carry out its functions. The corporation's articles of incorporation state that the board of trustees will be elected at the annual congregational meeting. As noted, the congregation's bylaws require that the trustees be appointed by the session from a group of elders and approved at an annual congregational meeting. Moreover, the congregation's bylaws state that the church membership is "entitled at all meetings of the congregation to vote * * * on all matters affecting the corporate affairs, unless otherwise provided by the laws of the State of Oregon."

Having concluded that the acts of both the congregation and the corporation are relevant in determining whether Hope Presbyterian intended to hold its property in trust for the benefit of PCUSA, we turn to the requirements for expressing intent to create a trust and the acts of Hope Presbyterian that PCUSA claims expressed the necessary intent. Generally, a trust, including the settlor's manifestation of intent to create a trust, "need not be evidenced by a trust instrument[,]" unless required by statute, such as the statute of frauds. ORS 130.180. Evidence of intent to create a trust can include "written or spoken words or * * * conduct." *Restatement (Third) of Trusts* § 13 comment b (2003). Moreover, "[a]lthough the grantor's intent at the time of making the conveyance determines the nature of the interest created, it is permissible to look at the conduct of the parties after the conveyance in ascertaining that intent." *Belton v. Buesing*, 240 Or 399, 408, 402 P2d 98 (1965); *see also Oregon UTC & Comments*, 42 Willamette L Rev at 213-14 (citing *Restatement (Second) of Trusts* § 4 comment a (1959)); *Restatement (Second) of Trusts* § 4 comment a (1959) ("The intention of the settlor at the time of the

26

creation of the trust may * * * be shown by facts occurring after that time to the extent that evidence of such facts is admissible to show such intention under the rules of evidence."). Here, the amendment to the articles of incorporation, the amendment to the congregation's bylaws, and the relationship between the parties leading up to and following the adoption of the PCUSA constitution demonstrate Hope Presbyterian's intent to hold its property in trust for PCUSA.

As noted, the board of trustees and the members of the congregation adopted a document entitled Articles of Amendment in 1983. That document states,

"This corporation is a church congregation of and holds all property as trustee for the Presbyterian Church (U.S.A.)."

Hope Presbyterian notes several alleged deficiencies in that document that would have prevented it from being accepted by the Secretary of State, including that it uses a different name for the corporation than the name that was on record with the Secretary of State.[6] Notwithstanding those deficiencies, we conclude, as did the Court of Appeals, that the document shows that both the board of trustees of the corporation and the members of the congregation approved a document that recited the intent to hold Hope Presbyterian's property in trust for PCUSA.

Moreover, the statement in the Articles of Amendment is not the only

---

[6] Hope Presbyterian argues that it has never used the name "Hope 'Community' or 'United' Presbyterian Church," the name used on the Articles of Amendment. However, multiple deeds in the record convey property to Hope Community Presbyterian Church, which indicates that that is a name that the church used in some instances.

evidence of Hope Presbyterian's intent. Hope Presbyterian was a member of the Presbytery of the Cascades when the Presbytery voted in 1980 to approve an amendment to include an express trust provision in the constitution of PCUSA's predecessor. Hope Presbyterian remained a member of the Presbytery of the Cascades after that vote, and three years later, two members of Hope Presbyterian attended the meeting where the Presbytery voted to approve the adoption of PCUSA's constitution, which also included an express trust provision. The congregation subsequently amended its bylaws in 1983 to state its intent to be "governed in all its provisions by the <u>Constitution of the Presbyterian Church, U.S.A.</u>" (Underscoring in original.) Then, for more than 20 years after Hope Presbyterian's bylaw amendment, the congregation's conduct showed that Hope Presbyterian remained affiliated with PCUSA and subject to its constitution. For example, Hope Presbyterian continued to send representatives to Presbytery meetings and sought approval from the Presbytery when buying or selling property, in accordance with the *Book of Order*. That lengthy history of conduct provides additional insight into Hope Presbyterian's intent to hold its property in trust for PCUSA

Based on Hope Presbyterian's conduct, PCUSA's constitution cannot be irrelevant, as Hope Presbyterian contends -- even though it is not dispositive, as PCUSA contends. By voluntarily associating with the denominational church when Hope Presbyterian first organized in 1901 -- and remaining associated with the denominational church for over 100 years until 2007 -- Hope Presbyterian demonstrated that it intended to be bound by the governing documents of the church, including the constitution containing the express trust provision. In applying the neutral principles approach, we do

28

not treat as dispositive the "orders and judgments" of the denominational church in resolving church property disputes, as the Supreme Court did in *Watson*, 80 US 679, but we cannot ignore Hope Presbyterian's long history of voluntary association with PCUSA (and its predecessors) and its express assent to the *Book of Order* in 1983. *See In re Episcopal Church Cases*, 45 Cal 4th at 493, 198 P3d at 84 (adopting neutral principles approach, but finding for the denominational church in part because the documents at issue "show[ed] that the local church agreed and intended to be part of a larger entity and to be bound by the rules and governing documents of that greater entity"). Hope Presbyterian's affiliation with PCUSA both before and after the adoption of the express trust provision demonstrates that it intended to hold its property in trust for PCUSA.

Hope Presbyterian argues that, even if there is evidence of intent, the trust fails under the statute of frauds. As noted, although ORS 130.180 states that a trust does not generally need to be evidenced by a trust instrument, ORS 130.180 also acknowledges that a trust instrument might be required by statutes other than the Uniform Trust Code, such as the statute of frauds. Here, Hope Presbyterian argues that the trust does not meet the standard set forth in ORS 93.020(1):

> "No estate or interest in real property, other than a lease for term not exceeding one year, nor any trust or power concerning such property, can be created, transferred or declared otherwise than by operation of law or by a conveyance or other instrument in writing, subscribed by the party creating, transferring or declaring it * * * and executed with such formalities as are required by law."

ORS 93.020(1) is a codification of the statute of frauds as it relates to real property, in addition to the statute of frauds set forth in ORS 41.580. *See, e.g.*, *Smiley v. King*, 278 Or

29

555, 561, 564 P2d 1348 (1977) (referring to ORS 93.020(1) as the statute of frauds). While the Articles of Amendment may lack some of the formalities of a typical trust instrument, "'[a]ny writing, however informal, is sufficient to satisfy the statute [of frauds], if it contain[s] a complete statement of the trust, and is signed or subscribed by the proper party.'" *Heitkemper v. Schmeer*, 130 Or 644, 656, 275 P 55, *on reh'g*, 281 P 169 (1929) (quoting George Gleason Bogert, *Handbook of the Law of Trusts* § 20, 54 (1921)); *see also* Austin Wakeman Scott, William Franklin Fratcher & Mark L. Ascher, 1 *Scott and Ascher on Trusts* § 6.5, 292 (5th ed 2006) ("[T]he writing required by the statute of frauds may be anything written, formal or informal, signed by the proper party."). Here, the Articles of Amendment contain a statement that Hope Presbyterian will hold all property as trustee for the benefit of PCUSA, and the document was signed by both the corporation's president and secretary, who presumably had authority to act on behalf of the corporation. Thus, there is a writing declaring the trust that is signed by the proper parties, satisfying the requirements of ORS 93.020(1) and creating the trust.

Hope Presbyterian argues that, even if a trust was created, it was free to, and did, revoke that trust. Hope Presbyterian relies on ORS 130.505(1) for its authority to revoke the trust. ORS 130.505(1) provides:

> "Unless the terms of a trust expressly provide that the trust is irrevocable, the settlor of the trust may revoke or amend the trust."

As noted, the Uniform Trust Code, of which ORS 130.505(1) is a part, was enacted in 2005. That particular provision, however, does not apply to trusts created before the effective date of Oregon's Uniform Trust Code. Or Laws 2005, ch 348, § 47, *compiled as*

*a note after* ORS 130.505 (2011) ("Section 46 (1) of this 2005 Act [ORS 130.505 (1)] does not apply to a trust created under an instrument executed before the effective date of this 2005 Act [January 1, 2006]."). The choice not to make the revocability provision retroactive appears to be based in part on the fact that that provision changed Oregon's common law of trusts. *See Oregon UTC & Comments*, 42 Willamette L Rev at 307 (noting change to Oregon common law); David M. English, Reporter, Uniform Trust Code (2000), *The Uniform Trust Code (2000): Significant Provisions and Policy Issues*, 67 Mo L Rev 143, 187 (2002) ("Because the Code's presumption of revocability will reverse the rule in most jurisdictions, the presumption applies only to trust instruments executed on or after the date of enactment."). Therefore, for trusts created before January 1, 2006, the common law applies to determine whether the trust is revocable. *See* ORS 130.025 ("The common law of trusts and principles of equity supplement this chapter, except to the extent modified by this chapter or other law."). Under Oregon common law, a trust was irrevocable "unless the settlor reserve[d] the power of revocation * * *." *Stipe v. First National Bank*, 208 Or 251, 268, 301 P2d 175 (1956). In this case, the parties agree that if a trust was created, it was created in 1983. Therefore, because the trust was created before 2006, the common law applies, and the trust is irrevocable unless the settlor, Hope Presbyterian, reserved the power of revocation.

In the absence of an express provision declaring the trust revocable, a settlor may reserve the power of revocation if the settlor uses words from which a right to revoke can be inferred or if the settlor demonstrates the intent for the trust to be revocable through extrinsic evidence. Austin Wakeman Scott, William Franklin Fratcher & Mark

31

L. Ascher, 5 *Scott and Ascher on Trusts* § 35.1, 2278-79 (5th ed 2008).  Hope Presbyterian, however, argues only that it has the right to revoke the trust under ORS 130.505(1).  Hope Presbyterian argued to the trial court that imposing an irrevocable trust would be "unjust" because the church has been "self-supporting" throughout its history.  However, because consideration is not required for the formation of a trust, and the presence or absence of consideration does not bear on the revocability of a trust, support provided or not provided by PCUSA is immaterial to the determination of revocability.  *Stipe*, 208 Or at 266-68 (no consideration required for creation of trust and mere absence of consideration does not make trust revocable).

Moreover, nothing in the record indicates that Hope Presbyterian intended the express trust to be revocable, rather than irrevocable.  Although the Articles of Amendment were never filed with the Secretary of State, they were approved, without reserving any right of revocation, by both the congregation and the board of trustees.  Nothing in the text of either the Articles of Amendment or the bylaws -- or in any other document in the record -- states or suggests that Hope Presbyterian reserved the power of revocation.

Although a settlor generally cannot unilaterally revoke an irrevocable trust, ORS 130.200(1) allows for modification or termination of an irrevocable trust with approval of the court "upon consent of the settlor and all beneficiaries[.]"  Here, beneficiary PCUSA did not consent to termination of the trust.  The Presbytery of the Cascades, the regional presbytery, had begun meeting with Hope Presbyterian regarding disaffiliation before the disaffiliation vote, in accordance with the provision in the *Book*

32

*of Order* granting the presbytery the authority to dismiss local churches, and those meetings continued after the vote. Although that process may have offered a means for obtaining the beneficiary's consent to the revocation of the trust, the process was essentially halted when Hope Presbyterian filed its motion for summary judgment. Modification or termination of a trust can also take place without the consent of the beneficiary if the court finds that "[t]he interests of any beneficiary who does not consent will be adequately protected." ORS 130.200(5)(b). That is not the case here, of course, because termination would eliminate PCUSA's interest and the protections it is entitled to as a beneficiary. Because ORS 130.200 does not apply, Hope Presbyterian did not have a right to unilaterally revoke the trust.[7]

For the foregoing reasons, we agree with the Court of Appeals that, under the neutral principles approach to resolving church property disputes, Hope Presbyterian held its property in trust for the benefit of PCUSA.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for entry of a judgment in favor of Presbyterian Church (U.S.A.).

---

[7] Hope Presbyterian raises several additional legal arguments concerning the creation -- and alleged revocation -- of the trust. We reject those arguments without discussion. Hope Presbyterian also identifies other facts that, it asserts, support its legal position on those issues. However, nothing in the record demonstrates any genuine dispute as to any fact that would be material to the dispositive legal issues. Indeed, both parties moved for summary judgment in their favor in the trial court and, in briefing and argument in the Court of Appeals and in this court, neither party sought a remand to the trial court for further development of the factual record.

33