# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 5, 2017 Session

## CHURCH OF GOD IN CHRIST, INC., ET AL. v. L. M. HALEY MINISTRIES, INC., ET AL.

### Appeal by Permission from the Court of Appeals
### Chancery Court for Fayette County
### No. 15815    Martha B. Brasfield, Chancellor

_____

### No. W2015-00509-SC-R11-CV – Filed September 21, 2017

_____

We granted this appeal to determine whether the Court of Appeals properly affirmed the trial court's decision dismissing this lawsuit involving a dispute over the right to use and control church property for lack of subject matter jurisdiction based on the ecclesiastical abstention doctrine. This doctrine derives from the First Amendment to the United States Constitution and prohibits civil courts from resolving church disputes on the basis of religious doctrine and practice. We conclude that the ecclesiastical abstention doctrine does not apply in this lawsuit. Accordingly, the judgment of the Court of Appeals affirming the trial court's dismissal is reversed. Furthermore, we conclude that the undisputed facts establish that the plaintiffs are entitled to summary judgment, and we remand this matter to the trial court for any other further proceedings and orders that may be necessary to afford the plaintiffs possession and control of the disputed church real property and to address the plaintiffs' requests for an accounting and control of the disputed church personal property.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., SHARON G. LEE, and ROGER A. PAGE, JJ., joined. HOLLY KIRBY, J., filed a concurring opinion.

Darrell James O'Neal, Memphis, Tennessee, for the appellants, Church of God in Christ, Inc., Bishop David A. Hall, Gospel Center Temple Church of God in Christ, and Gospel Temple Church of God in Christ.

Robert L.J. Spence, Jr., Bryan M. Meredith, and Veronica F. Coleman-Davis, Memphis, Tennessee, for the appellees, L. M. Haley Ministries, Inc., Gospel Center Temple Church Moscow, Inc., Lonnie M. Haley, III, Jeremiah R. Haley, Ulysses C. Polk, Barry C. Turner, Milton Holt, Sr., and Erskine J. Murphy.

## OPINION

### I.  Factual and Procedural Background

The Church of God in Christ, Incorporated ("COGIC") is a national not-for-profit religious corporation established on December 12, 1922, under the laws of Tennessee, with its principal business office located in Memphis.  COGIC has adopted a hierarchical structure of governance for its member churches.[1]  The COGIC constitution, which provides "for the civil and ecclesiastical structure of the church together with laws, rules, and regulations for the entire church, including [local churches]" is compiled in The Official Manual.[2]  Pursuant to these governing principles, COGIC is divided into Ecclesiastical Jurisdictions, and a Jurisdictional Bishop presides over each Ecclesiastical Jurisdiction.  The Official Manual declares that "[t]he Pastor of the local church shall be appointed by the Jurisdictional Bishop of the Ecclesiastical Jurisdiction of the Church." This provision also states: "All vacancies that occur in the pastorate of the local church shall be filled by the Jurisdictional Bishop.  The supervision and management of the church shall remain with the Jurisdictional Bishop or his designee until such time as a pastor has been appointed to fill such vacancy."

According to the allegations of the second amended complaint, Gospel Center Temple COGIC ("Temple COGIC"), located at 16885 Highway 57, Moscow, Fayette County, Tennessee, was founded "many years ago."  At the time of its founding, Temple COGIC "assumed the vows of membership with [COGIC] and declared it[s] willingness to submit to and abide by the government of [COGIC]," including The Official Manual.

---

[1] See Church of God in Christ, Inc. v. Middle City Church of God in Christ, 774 S.W.2d 950, 951 (Tenn. Ct. App. 1989) (stating that COGIC local churches operate as part of a "connectional system"); Convention of Protestant Episcopal Church in Diocese of Tenn. v. Rector, Wardens, & Vestrymen of Saint Andrew's Parish, No. M2010-01474-COA-R3-CV, 2012 WL 1454846, at *20 n.16 (Tenn. Ct. App. Apr. 25, 2012) [hereinafter Saint Andrew's] (stating that "connectional" and "hierarchical" mean the same thing).

[2] The second amended complaint, from which this appeal arises, states that "The Official Manual, as amended, is incorporated herein as if set forth in its entirety," but The Official Manual actually is not included in the record on appeal.  Nevertheless, the relevant provisions of The Official Manual are quoted in the second amended complaint.  The parties do not dispute the accuracy of these quotations, and we will accept these quotations as accurate for purposes of this appeal.

In return, COGIC issued Temple COGIC "[a] certificate of membership"[3] and assigned Temple COGIC to the Tennessee Headquarters Ecclesiastical Jurisdiction ("THEJ").

L. M. Haley, Jr. founded Temple COGIC and served as its duly appointed pastor until his death on October 10, 2009. Thereafter the Jurisdictional Bishop for THEJ, Bishop J.O. Patterson, Jr., "declined to name a pastor and temporarily assumed the pastorship of [Temple COGIC]," as authorized by The Official Manual.[4]

Bishop Patterson died in June 2011, and Bishop David A. Hall thereafter was appointed Jurisdictional Bishop for THEJ. Like his predecessor, Bishop Hall chose to serve as pastor of Temple COGIC rather than appoint someone else to the position. Unfortunately, not everyone at Temple COGIC was satisfied with Bishop Hall's decision, and in October 2011, those dissatisfied with the decision sought the advice of a lawyer, also an elder in COGIC, about their options. In a letter included in the record on appeal, this attorney summarized the advice he had given, explaining that the members of Temple COGIC had an "absolute right to vote to move to another [Ecclesiastical] [J]urisdiction" but cautioned that, "if they [were] to remain in COGIC[,] they must follow the church's polity, including accepting the Bishop's appointment of Pastors." He explained that, "if they desire[ed] to fellowship with another [Ecclesiastical] [J]urisdiction [of COGIC], they should present their petition to the General Board requesting a vote of the membership."

Thereafter, the General Secretary of COGIC received a letter advising that a majority of the members of Temple COGIC had voted to transfer to another Ecclesiastical Jurisdiction.[5] The General Secretary responded with a letter explaining that the election would not be recognized as valid because it had not been conducted in compliance with COGIC procedures, contained in The Official Manual, for obtaining a transfer to another Ecclesiastical Jurisdiction. The General Secretary provided a copy of the applicable procedures and invited the recipients of the letter to contact his office

---

[3] Temple COGIC's certificate of membership is not included in the record on appeal.

[4] According to allegations in the second amended complaint, Bishop Patterson exercised this option "because of a conflict between various members of the family of L. M. Haley, Jr., over which of them should be named pastor of [Temple COGIC]." The rationale for Bishop Patterson's decision is not relevant to the issues in this appeal.

[5] The second amended complaint alleges that notice of the election was provided only to Temple COGIC members favoring a transfer and that members who were believed to oppose a transfer were not informed of the election or given an opportunity to vote on the issue. Any dispute regarding these allegations is not relevant to the dispositive issues in this appeal.

should additional information or assistance be needed. The General Secretary did not receive any additional correspondence regarding a transfer.

However, on December 16, 2011, a corporate charter was filed with the Tennessee Secretary of State's Office creating Gospel Center Temple Church Moscow, Inc. ("Moscow Church"). The Moscow Church's corporate charter listed its business address as 16885 Highway 57, Moscow, Fayette County, Tennessee, the same address as Temple COGIC. Neither the corporate charter nor any other document in the record on appeal indicates that the Moscow Church was organized as a member church of COGIC. Another Tennessee corporation, L. M. Haley Ministries, Incorporated ("L. M. Haley Ministries"), had been formed previously by the founding pastor of Temple COGIC and had also listed 16885 Highway 57, Moscow, Fayette County, Tennessee, as its registered office and principal place of business. Nevertheless, according to a September 17, 2000 deed, the grantees for the real property located at this address were Temple COGIC, Ella Mary Cox, Milton E. Holt, Sr., Lonnie M. Haley, Janice Murphy, John W. Arnett, and Erskine J. Murphy, *Trustees for the use and benefit of Temple COGIC [and] its assigns*. Neither the Moscow Church nor L. M. Haley Ministries was listed on the deed as having any interest in the property. The September 17, 2000 deed also did not expressly list COGIC as having an interest in the property, but The Official Manual includes the following provision:

> Real estate or other property may be acquired by purchase, gift[,] devise, or otherwise, by local churches. Where real or personal property is acquired by deed, the instrument of conveyance shall contain the following clause, to wit;

>> The said property is held in trust for the use and benefit of the members of the Church of God in Christ with National Headquarters in the City of Memphis, Shelby County, Tennessee, and subject to the Charter, Constitution, Laws and Doctrines of said Church, now in full force and effect, or as they may be hereafter amended, changed or modifies [sic] by the General Assembly of said Church.

This same language is repeated, verbatim, in another part of The Official Manual.[6]

---

[6] According to the second amended complaint, the quoted text appears in Part I, article III, section D.9 and is repeated verbatim in Part III, section A.8.

Despite the language of the September 17, 2000 deed and that of The Official Manual, on December 29, 2011, Barry C. Turner, Erskine J. Murphy, and Milton Holt, Sr., "holding themselves out to be the sole Trustees of [Temple COGIC] executed and recorded a Quit Claim Deed attempting to transfer" the real property located at 16885 Highway 57, Moscow, Fayette County, Tennessee to the Moscow Church. On January 2, 2012, four days after the quit claim deed was executed, Bishop Hall attempted to hold services at Temple COGIC, but he was barred from entering the premises. A Fayette County Sheriff's Deputy allegedly called in by those associated with the Moscow Church advised Bishop Hall "that he should either leave or be arrested."

A month later, on February 2, 2012, this lawsuit was filed. Bishop Hall filed the initial complaint, individually and on behalf of Temple COGIC. After the complaint was amended once, the defense filed a motion to dismiss. The trial court concluded that Bishop Hall may have lacked standing to file the lawsuit on his own, but it granted him permission to file a second amended complaint. The second amended complaint, from which this appeal arises, was filed on July 29, 2013, by COGIC, Bishop Hall, individually and on behalf of Temple COGIC, and Temple COGIC, by and through its duly appointed trustee, John Arnett (collectively "the Plaintiffs"). Named as defendants in the second amended complaint were: (1) L. M. Haley Ministries; (2) the Moscow Church; (3) L. M. Haley, III, (4) Jeremiah R. Haley; (5) Ulysses C. Polk; (6) Barry C. Turner; (7) Milton Holt, Sr.; and (8) Erskine J. Murphy (collectively "the Defendants").

In the second amended complaint, the Plaintiffs alleged that the Moscow Church and L. M. Haley Ministries, by and through their directors, had "unlawfully assumed control of [Temple COGIC's] real property." As factual support for this assertion, the Plaintiffs alleged that Bishop Hall, Temple COGIC's duly appointed pastor and Jurisdictional Bishop, had been barred from entering Temple COGIC on threat of arrest by a Fayette County Sheriff's Deputy. The Plaintiffs also alleged that one of the Defendants, Erskine J. Murphy, had removed church documents from Temple COGIC, including the checkbook and financial records, and that, by doing so, had deprived Bishop Hall of access to materials needed to fulfill his responsibility to administer and supervise Temple COGIC.

As the basis for their claim to the real property and to control of the bank accounts, records, and other personal property of Temple COGIC, the Plaintiffs pointed to the language of the September 17, 2000 deed and that of The Official Manual. The Plaintiffs asked the trial court: (1) to order the Defendants "to remove themselves from control" of Temple COGIC and "restore" Temple COGIC and its property and funds to the Plaintiffs; (2) to declare the December 29, 2011 quit claim deed to the Moscow Church null and void as a fraudulent transfer; (3) to restructure the September 17, 2000 deed to reflect that the real property is held in trust for the use and benefit of COGIC, with national headquarters in Memphis, Tennessee, and subject to the Charter, Constitution, Laws and Doctrines of COGIC, "now in full force and effect, or as they

may be hereafter amended, changed or modified by the [COGIC] General Assembly"; (4) to order the Defendants to account for all income and expenditures from January 1, 2011 to the present; and (5) to issue a temporary restraining order preventing the Defendants from using Temple COGIC funds pending resolution of the lawsuit.

In their answers to the second amended complaint, the Defendants denied that Bishop Hall was the lawful pastor of Temple COGIC.[7] The Defendants also moved to dismiss the second amended complaint for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, arguing that the Plaintiffs were asking the trial court "to exercise jurisdiction over a purely ecclesiastical and religious dispute as to who shall be the church's pastor and thereby control the church's property and funds."

On December 6, 2013, the Plaintiffs filed a memorandum of law in opposition to the Defendants' motions to dismiss.[8] The Plaintiffs reiterated the allegations of the second amended complaint and also provided a copy of a decision handed down on November 23, 2013, by an Ecclesiastical Council of COGIC. The memorandum of law stated that, in February 2013, certain members of Temple COGIC brought charges against several other members of the congregation, including some of the Defendants in this lawsuit, alleging that these members were violating COGIC polity and unlawfully exercising control over Temple COGIC property.[9] An internal COGIC investigation ensued, which culminated in a trial before the Ecclesiastical Council on November 23, 2013. Those charged were notified of the trial but did not appear. After the hearing, at which sworn complaints and testimony were presented, the Ecclesiastical Council rendered its decision, finding that the Defendants "ha[d] ignored the requests and admonitions of [COGIC officials] to follow the polity of [COGIC]"; were operating Temple COGIC in violation of the COGIC constitution and The Official Manual; had

---

[7] The Moscow Church, Jeremiah R. Haley, Ulysses C. Polk, Barry C. Turner, Milton Holt, Sr., and Erskine J. Murphy jointly filed an answer by and through counsel on August 13, 2013. L. M. Haley Ministries and Lonnie M. Haley, III, jointly filed an answer through counsel on August 21, 2013.

[8] On November 14, 2013, the Plaintiffs filed a motion asking the trial court to stay the proceedings until after "an ecclesiastical trial to resolve the issues in the instant case involving property rights, local church leadership, and local church management." By a separate motion, the Plaintiffs asked the trial court to refer the case to mediation. The Defendants filed a response opposing the reference to mediation. If the trial court ruled on these motions, the trial court's rulings are not included in the record on appeal.

[9] According to the Ecclesiastical Council's decision, the complainants were Bishop Hall on behalf of COGIC and Temple COGIC, and the respondents were Temple COGIC, Jerry E. Murphy, Joyce A. Murphy, Barry C. Turner, Clementine Turner, Barry D. Turner, Milton Holt, Sr., Annie Holt, Elizabeth Houston-Arnett, and Randy Arnett.

refused to acknowledge Bishop Hall, who was their duly appointed Jurisdictional Bishop and pastor; had caused Bishop Hall to be physically removed from church services at the Temple COGIC premises; had interfered with Bishop Hall's lawful attempt to manage the bank accounts of Temple COGIC and persuaded the bank not to place those accounts under his control; had unlawfully attempted to transfer ownership of Temple COGIC property; and had improperly called a vote to transfer Ecclesiastical Jurisdictions. Based on these findings, the Ecclesiastical Council found those charged guilty of certain offenses, and excommunicated nine persons from membership in COGIC and Temple COGIC, including two of the Defendants in this lawsuit—Barry C. Turner and Milton Holt, Sr. The Ecclesiastical Council ordered the reorganization of Temple COGIC under the pastoral leadership of Bishop Hall, directed that Temple COGIC's "personal property . . . , including cash, bank accounts, records and the like" be turned over to Bishop Hall, to hold in trust for Temple COGIC, and directed that Temple COGIC's real property be held in trust in accordance with The Official Manual.

In a December 6, 2013 memorandum of law opposing the Defendants' motion to dismiss, the Plaintiffs argued that the Defendants, by refusing to comply with the November 23, 2013 Ecclesiastical Council ruling, had forced the Plaintiffs to seek civil remedies "to resolve this impasse over property rights." The Plaintiffs acknowledged the ecclesiastical abstention doctrine, but they asserted that it does not apply here because this case involves a church property dispute over which civil courts have jurisdiction, not a dispute about ecclesiastical matters.

On February 3, 2014, the Defendants renewed their motion to dismiss the second amended complaint, relying on materials previously submitted. The Defendants asserted, despite the decision of the Ecclesiastical Council, that "the gravamen of this case still requires the [c]ourt to engage in a review of ecclesiastical doctrine and determine who should pastor and manage [Temple COGIC] simply to control the church's personal and real property."

On May 7, 2014, the Plaintiffs moved for summary judgment and alternatively asked the court "to make such findings of fact and conclusions as is proper under the premises." Defendants apparently did not respond to the motion for summary judgment, or if they did, the response is not included in the record on appeal.

On June 24, 2014, the Plaintiffs filed a supplement to their original memorandum of law in opposition to the Defendants' motions to dismiss. The Plaintiffs adopted and incorporated by reference affidavits from: (1) Bishop Hall; (2) COGIC's General Counsel; and (3) COGIC's General Secretary, all of which had previously been submitted. In his affidavit, Bishop Hall essentially reiterated the allegations of the second amended complaint and described the Ecclesiastical Council's ruling. In his affidavit, COGIC's General Counsel stated, among other things, that Bishop Hall "was duly appointed as Jurisdictional Bishop of the Tennessee Headquarters Ecclesiastical

Jurisdiction of [COGIC] of which [Temple COGIC] is a member church." The General Counsel also stated that, at the time of Bishop Hall's appointment, no pastor had been appointed to Temple COGIC, and therefore, Bishop Hall became the pastor of Temple COGIC upon his appointment as Jurisdictional Bishop, pursuant to The Official Manual. The General Counsel stated that "there is no ecclesiastical controversy concerning the leadership and management of [Temple COGIC]–Bishop Hall is the Pastor of [Temple COGIC] according to the COGIC Constitution." Finally, the General Secretary's affidavit stated that Bishop Hall was the duly appointed Jurisdictional Bishop for Temple COGIC's Ecclesiastical Jurisdiction and that, under COGIC's constitution and polity, Bishop Hall became the pastor of Temple COGIC in November 2011, "upon being consecrated as Jurisdictional Bishop." The General Secretary also stated that the November 23, 2013 ruling of the Ecclesiastical Council had not been appealed and, as a result, had become "final and binding upon [Temple COGIC] and the Charge[d] Parties according to the COGIC Constitution."

On February 18, 2015, the trial court dismissed the Plaintiffs' motion for summary judgment without a hearing and without requiring the Defendants to respond, explaining that the Plaintiffs had failed to set out "a separate and concise statement of material facts as to which the moving party contends there is no genuine issue for trial," as required by Rule 56.03 of the Tennessee Rules of Civil Procedure. The trial court granted the Defendants' motions to dismiss the second amended complaint. In doing so, the trial court emphasized that its ruling was based on the allegations of the pleadings alone, and that it had not considered any of the other materials the parties had submitted. The trial court explained the basis for its decision to grant the motion to dismiss as follows:

> The Court finds that this lawsuit deals with ecclesiastical issues. The Plaintiffs have been very careful to couch their lawsuit and prayer for relief by alleging that this lawsuit concerns property rights. However, this lawsuit is actually about control, and who makes the decision concerning the control of the church and the church funds. These are denominational and ecclesiastical issues. The Court [] does not have jurisdiction to declare the Quit Claim Deed to [the Moscow Church] void or to restructure the deed at the present time because the congregation has not withdrawn from the COGIC denomination.

The Plaintiffs appealed. In a divided decision, the Court of Appeals affirmed the trial court's dismissal of the second amended complaint. Church of God in Christ, Inc. et al. v. L. M. Haley Ministries, Inc. et al., No. W2015-00509-COA-R3-CV, 2016 WL 325499, at *11 (Tenn. Ct. App. Jan. 27, 2016), perm. app. granted (Tenn. Aug. 18, 2016). On the basis of the ecclesiastical abstention doctrine, the majority "decline[d] to interfere with this intra-church dispute over the creation of a trust for COGIC of [Temple COGIC's] real property," explaining that there had been "no showing that [Temple COGIC] has in any way terminated its affiliation with COGIC." Id. at *9. The majority

also affirmed dismissal of the personal property claim on the basis of the ecclesiastical abstention doctrine, explaining that civil courts have "no subject matter jurisdiction to declare that Bishop Hall is the lawful leader of [Temple COGIC], imbued with all attendant authority." Id. at *10. One judge dissented, arguing that the ecclesiastical abstention doctrine does not apply in this case, because "resolution of the dispute among the parties is not dependent on the trial court's ruling on matters of conscience or religious doctrine or polity." Id. at *11 (Goldin, J., dissenting).

The Defendants filed an application for permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. We granted the application, and in the order doing so, directed the parties to brief and argue the following issues, in addition to those raised in the Rule 11 application:

1. Whether, in light of the decision of the United States Supreme Court in Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission, [565 U.S. 171] (2012), this Court should no longer treat the ecclesiastical abstention doctrine as a bar to subject matter jurisdiction, and instead should treat the doctrine as an affirmative defense which may be raised by a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure.

2. If the answer to issue 1 is in the affirmative, whether the record establishes that the ecclesiastical abstention doctrine applies, such that [the P]laintiffs have failed to state a claim upon which relief can be granted.

3. If the answer to issue 1 is in the negative, whether this Court should abandon the analytical distinction between facial and factual challenges to subject matter jurisdiction, see Redwing v. Catholic Bishop for the Diocese of Memphis, 363 S.W.3d 436, 445-46 (Tenn. 2012); and if so, whether in the absence of that analytical distinction the record establishes that the ecclesiastical abstention doctrine applies and that the trial court, therefore, lacked subject matter jurisdiction.

Church of God in Christ, Inc. et al. v. L. M. Haley Ministries, Inc. et al., No. W2015-00509-SC-R11-CV (Tenn. Aug. 18, 2016) (order granting Tennessee Rule of Appellate Procedure 11 application). To answer the questions presented in this appeal, we must review the principles that courts have developed and applied, albeit not always consistently, to resolve church property disputes.

## II. Analysis

### A. *The Ecclesiastical Abstention Doctrine:*
### *Subject Matter Jurisdictional Bar or Affirmative Defense?*

The ecclesiastical abstention doctrine, also commonly known as the "church autonomy doctrine," Redwing, 363 S.W.3d at 443 n.3, precludes civil courts in this country from adjudicating "questions of discipline, or of faith, or ecclesiastical rule, custom, or law" or church polity, or the internal governance of religious organizations. Watson v. Jones, 80 U.S. 679, 727 (1871); see also Redwing, 363 S.W.3d at 448; Nance v. Busby, 18 S.W. 874, 881 (Tenn. 1892). This doctrine is now clearly understood as deriving from the Religion Clauses of the First Amendment to the United States Constitution.[10] See Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C., 565 U.S. 171, 186 (2012) [hereinafter Hosanna-Tabor]; Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 115-16 (1952). We asked the parties to address whether the ecclesiastical abstention doctrine operates as a bar to subject matter jurisdiction or is an affirmative defense. The proper characterization of this concept is important because subject matter jurisdiction refers to the power of a court to adjudicate a controversy. Word v. Metro Air Servs., Inc., 377 S.W.3d 671, 674 (Tenn. 2012). "Whether subject matter jurisdiction exists depends on the nature of the cause of action and the relief sought." Id. (citing Landers v. Jones, 872 S.W.2d 674, 675 (Tenn. 1994)). A challenge to subject matter jurisdiction cannot be waived and may be raised at any time. Johnson v. Hopkins, 432 S.W.3d 840, 843-44 (Tenn. 2013); In re Estate of Brown, 402 S.W.3d 193, 199 (Tenn. 2013). In contrast, "[a]n affirmative defense is one that wholly or partly avoids the cause of action asserted by the preceding pleading by new allegations that admit part or all of the cause of action, but avoids liability because of a legally sufficient excuse, justification, or other matter negating the alleged breach or wrong." Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin, 765 S.W.2d 743, 744 (Tenn. Ct. App. 1987) (quoting Lawrence A. Pivnick, Tennessee Circuit Court Practice § 12: 4 (2nd Ed. 1986)); see also Tenn. R. Civ. P. 8.03. An affirmative defense generally is deemed waived unless timely raised in an answer or responsive pleading. See Tenn. R. Civ. P. 12.08; Pratcher v. Methodist Healthcare Memphis Hosps., 407 S.W.3d 727, 735 (Tenn. 2013) (discussing affirmative defenses).

We asked the parties to brief this question because, in 2012, the United States Supreme Court held that another doctrine derived from the Religion Clauses of the First Amendment—the ministerial exception—constitutes an affirmative defense, not a subject

---

[10] The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The First Amendment is applicable to the States through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

matter jurisdictional bar.  Hosanna-Tabor, 565 U.S. at 195 n.4.  In Hosanna-Tabor, the Supreme Court explained that the ministerial exception precludes applying federal civil rights laws to a religious institution when applying those laws would interfere with a religious organization's determination of who may serve as its ministers.  Id. at 188. Settling a disagreement among the lower courts, the Supreme Court held that the ministerial exception functions as an affirmative defense, not a jurisdictional bar, because civil courts have subject matter jurisdiction over claims based on federal civil rights statutes.  Id. at 195 n.4.  The ministerial exception does not deprive civil courts of this jurisdiction, explained the Supreme Court, but raises the question of whether the plaintiff in such a case is entitled to relief on the claim.  Id.

Notably, however, the Supreme Court did not address the ecclesiastical abstention doctrine in Hosanna-Tabor. Although both concepts derive from the First Amendment, the ecclesiastical abstention doctrine predates the ministerial exception by almost a century.  Compare Watson, 80 U.S. at 733 (recognizing the ecclesiastical abstention doctrine in 1871) with Hosanna-Tabor, 565 U.S. at 188 (stating that federal circuit courts of appeal had recognized the ministerial exception after passage of Title VII of the Civil Rights Act of 1964).  The Supreme Court itself has described the ecclesiastical abstention doctrine in a manner that suggests it constitutes a subject matter jurisdictional bar, where applicable.  Specifically, the Supreme Court stated that civil courts exercise "no jurisdiction" over a matter "strictly and purely ecclesiastical in its character." Watson, 80 U.S. at 733.  The Supreme Court defined ecclesiastical disputes as matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them."  Id. at 733; see also Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich, 426 U.S. 696, 713-14 (1976) (quoting Watson, 80 U.S. at 733).  Likewise, this Court "strongly embraced the ecclesiastical abstention doctrine" just twenty years after Watson, Redwing, 363 S.W.3d at 448-49 (quoting Nance, 18 S.W. at 879), and has applied the ecclesiastical abstention doctrine as a subject matter jurisdictional bar precluding judicial review of ecclesiastical matters,  see, e.g., Mason v. Winstead, 265 S.W.2d 561, 563 (Tenn. 1954) (removal of a minister); Travers v. Abbey, 58 S.W. 247, 247-48 (Tenn. 1900) (removal of a minister); see also Redwing, 363 S.W.3d at 445 (treating the assertion of the ecclesiastical abstention doctrine as a challenge to the court's subject matter jurisdiction); Bentley v. Shanks, 348 S.W.2d 900, 903 (Tenn. Ct. App. 1960) ("[C]ourts have no ecclesiastic jurisdiction, and do not pass upon questions of faith, religion, or conscience.").

A recent example of a Tennessee decision applying the ecclesiastical abstention doctrine as a subject matter jurisdictional bar is Anderson v. Watchtower Bible and Tract Soc'y of N.Y., Inc., No. M2004-01066-COA-R9-CV, 2007 WL 161035, at *1 (Tenn. Ct. App. Jan. 19, 2007).  There, expelled members of a religious organization brought a lawsuit against the religious organization and its leaders seeking money damages for their expulsion.  The religious organization moved to dismiss based on the ecclesiastical abstention doctrine.  The trial court denied the motion, and the Court of Appeals

reversed, holding that the plaintiff's claims were "barred by the First Amendment's protection of purely religious matters from interference by secular courts."  Id.

No language in Hosanna-Tabor alters the well-established principle stated in Watson that civil courts have no jurisdiction over matters purely ecclesiastical in character.  In the absence of any express language overruling Watson, and given that Hosanna-Tabor cites Watson with approval, we decline to interpret Hosanna-Tabor as abrogating Watson's characterization of the ecclesiastical abstention doctrine as a subject matter jurisdictional bar.  Hosanna-Tabor, 565 U.S. at 186-87.[11]  We therefore hold that, until and unless the United States Supreme Court declares otherwise, the ecclesiastical abstention doctrine, where it applies, functions as a subject matter jurisdictional bar that precludes civil courts from adjudicating disputes that are "strictly and purely

---

[11] Unlike Justice Kirby, we do not view the United States Supreme Court's decision in Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1 (1929) as relevant to the issue of whether the ecclesiastical abstention doctrine is a subject matter jurisdictional bar. The United States Supreme Court has cited Gonzalez only four times, and cited it most recently when it overruled Gonzalez. See Milivojevich, 426 U.S. 696 (1976).  In Milivojevich, the Supreme Court reiterated that "Watson had left civil courts no role to play in reviewing ecclesiastical decisions during the course of resolving church property disputes[.]" Id. at 712.  The Court stated that Gonzalez had included dictum about exceptions to the rule of Watson and had "adverted to the possibility of marginal civil court review" of decisions of ecclesiastical tribunals. Id.  The Milvojevich Court rejected the Gonzalez dictum, explaining that none of its prior decisions had "given concrete content to or applied" the Gonzalez exception allowing review of an ecclesiastical court's decision for arbitrariness. Id. at 712-13.  Thus we read Milivojevich as rejecting Gonzalez and reaffirming the rule announced in Watson that civil courts have no authority to resolve ecclesiastical disputes.

We also do not share Justice Kirby's belief that the Supreme Court's citation of Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 654 (10th Cir. 2002) in footnote four of Hosanna-Tabor to illustrate the circuit split on the proper characterization of the ministerial exception in some way indicates that the Supreme Court views the ecclesiastical abstention doctrine as an affirmative defense. To the contrary, Bryce involved an action brought by a former youth minister alleging sexual harassment in violation of federal civil rights laws based on statements the religious organization made about his homosexual relationship. Factually and legally, Bryce involved the ministerial exception only, and the Tenth Circuit held that the ministerial exception is an affirmative defense.  289 F.3d at 654.  But the proper characterization of the ecclesiastical abstention doctrine was not an issue in Bryce.

Because the ecclesiastical abstention doctrine ultimately does not apply in this property dispute case, our conclusion that the doctrine remains a subject matter jurisdictional bar is not controlling of the outcome of this appeal.  We will not hesitate to revisit this issue in an appropriate case if the United States Supreme Court eventually renders a decision that calls into question our conclusion that the doctrine remains a subject matter jurisdictional bar.

ecclesiastical" in character and which concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." Watson, 80 U.S. at 733. As such, the ecclesiastical abstention doctrine may be raised at any time as a basis for dismissal of a lawsuit.

That being said, however, the ecclesiastical abstention doctrine certainly does *not* apply in every legal dispute involving religious organizations. As this Court explained in Redwing in refusing to dismiss the tort claims there alleged against the religious organization, "the ecclesiastical abstention doctrine does not necessarily immunize religious institutions from all claims for damages based on negligent hiring, supervision, or retention. Tennessee's courts may address these claims, *as long as they can do so using neutral principles of law and can refrain from resolving religious disputes and from relying on religious doctrine*." 363 S.W.3d at 452 (emphasis added).

The same is true of church property disputes. Like the other causes of action identified in Redwing, the ecclesiastical abstention doctrine does not require dismissal of every church property dispute. As the Supreme Court has emphasized:

> There can be little doubt about the general authority of civil courts to resolve [disputes about the control and ownership of church property]. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of property can be determined conclusively.

Jones v. Wolf, 443 U.S. 595, 602 (1979). Nevertheless, the First Amendment, through the ecclesiastical abstention doctrine, "severely circumscribes the role that civil courts may play in resolving church property disputes." Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449 (1969) [hereinafter Blue Hull]. Specifically, civil courts are prohibited "from resolving church property disputes *on the basis of religious doctrine and practice*," Jones, 443 U.S. at 602 (emphasis added), and when resolving such disputes, must "defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." Id. (citing Milivojevich, 426 U.S. at 724-25). Our task here then is to determine whether this church property dispute may be decided without resolving questions of religious doctrine, polity, or practice. If not, then the ecclesiastical abstention doctrine would function as a subject matter jurisdictional bar precluding our resolution of this property dispute.

- 13 -

## B. *Facial Versus Factual Challenges to Subject Matter Jurisdiction*

Before determining whether the ecclesiastical abstention doctrine applies, however, we must first decide whether the distinction drawn in prior decisions between facial and factual challenges to subject matter jurisdiction should be abandoned. In Redwing, this Court addressed the distinction stating, "[l]itigants may take issue with a court's subject matter jurisdiction using either a facial challenge or a factual challenge." 363 S.W.3d at 445. A facial challenge attacks the complaint itself and asserts that the complaint, considered as a whole, fails to allege facts showing that the court has subject matter jurisdiction to hear the case. Id. at 445-46. When evaluating a facial challenge to subject matter jurisdiction, a court limits its consideration to the factual allegations of the complaint and considers nothing else. Id. The court presumes the factual allegations of the complaint are true. If these factual allegations establish a basis for the court's exercise of subject matter jurisdiction, then the court must uncritically accept those facts, end its inquiry, and deny the motion to dismiss. Id.; see also Staats v. McKinnon, 206 S.W.3d 532, 542-43 (Tenn. Ct. App. 2006); Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Thus, when evaluating facial challenges to subject matter jurisdiction, courts are to utilize the familiar analytical framework that applies to motions to dismiss for failure to state a claim. McKinnon, 206 S.W.3d at 543.

In contrast, factual challenges to subject matter jurisdiction do not attack the allegations of the complaint as insufficient. Id. at 543. Rather, a factual challenge admits that the alleged facts, if true, would establish subject matter jurisdiction, but it attacks the sufficiency of the evidence to prove the alleged jurisdictional facts. Redwing, 363 S.W.3d at 446; McKinnon, 206 S.W.3d at 543. When resolving a factual attack on subject matter jurisdiction, a court may consider matters outside the pleadings, such as affidavits or other documents. Anderson, 2007 WL 161035, at *32 n.23 (Tenn. Ct. App. Jan. 19, 2007); see also Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995); Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990); Hutterville Hutterian Brethren, Inc. v. Waldner, 791 N.W.2d 169, 174 (S.D. 2010); South v. Lujan, 336 P.3d 1000, 1003-1004 (N.M. Ct. App. 2014). Furthermore, motions challenging subject matter jurisdiction are not converted to summary judgment motions when matters outside the pleadings are considered or when disputes of material fact exist. Anderson, 2007 WL 161035, at *32 n.23; see also McKinnon, 206 S.W.3d at 543 (citing Chenault v. Walker, 36 S.W.3d 45, 55-56 (Tenn. 2001)). Rather, courts presented with such motions must weigh the evidence, resolve any factual disputes, and determine whether subject matter jurisdiction exists. Anderson, 2007 WL 161035, at *32 n.23; Hutterville Hutterian Brethren, Inc., 791 N.W.2d at 175 (stating that, when a factual attack is mounted on subject matter jurisdiction, "the court must also weigh the evidence and resolve disputed issues of fact affecting the merits of the jurisdictional dispute"); Osborn, 918 F.2d at 729-30 (agreeing with the rule adopted by a majority of the federal circuit courts of appeal that, when a factual challenge to subject matter jurisdiction is mounted, the court may resolve disputed issues of material fact and decide the merits of the jurisdictional issue);

- 14 -

5B Charles A. Wright et al., Federal Practice and Procedure § 1350 & n.47 (3d ed. Supp. 2017) [hereinafter Federal Practice and Procedure]. The trial court may hold an evidentiary hearing limited to the question of subject matter jurisdiction if necessary to resolve jurisdictional factual disputes. Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) ("[I]f subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own."); see also Osborn, 918 F.2d at 730; Hutterville Hutterian Brethren, Inc., 791 N.W.2d at 175. Regardless of the manner used, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over the case. McKinnon, 206 S.W.3d at 543 (citing Chenault, 36 S.W.3d at 56).

Having considered the relevant authorities, we decline to abolish the distinction between facial and factual challenges to subject matter jurisdiction. This distinction has been adopted by a majority of state and federal courts, 5B Federal Practice & Procedure Civ. § 1350, and remains helpful in analyzing challenges to subject matter jurisdiction, where it is applied properly.

Unfortunately, the trial court failed to apply it properly in this case. Here, the Defendants raised the ecclesiastical abstention doctrine in both a motion to dismiss for lack of subject matter jurisdiction and a motion to dismiss for failure to state a claim for relief. Tenn. R. Civ. P. 12.02 (1), (6). In dismissing the second amended complaint, the trial court considered only the factual allegations of the pleadings and refused to consider any of the other materials the parties submitted in support of and opposition to the motion. The trial court erred by limiting its consideration to the factual allegations of the complaint, rather than considering all the materials the parties submitted relevant to the assertion that the ecclesiastical abstention doctrine bars resolution of this property dispute. Here, the Defendants mounted a factual challenge to subject matter jurisdiction, and the Plaintiffs attempted to satisfy their burden of establishing subject matter jurisdiction by submitting materials showing that the alleged ecclesiastical question had already been resolved by the highest judicatory of COGIC. The trial court should have considered all of these materials when ruling on the Defendants' motion to dismiss. This analysis applies to motions alleging the ecclesiastical abstention doctrine as a jurisdictional bar under Tennessee Rule of Civil Procedure 12.02(1), as well as to motions brought under 12.02(6) alleging the ecclesiastical abstention doctrine as an affirmative defense. In both circumstances, the trial court should consider all of the materials provided on the subject, and not just the allegations of the complaint.

We need not remand this matter to the trial court, however, because, even considering the additional party submissions, the material facts are not in dispute.[12] Additionally, the parties were afforded the opportunity to present evidence and argument in the trial court on these issues, and the parties have been afforded the opportunity to brief and argue these issues on appeal.[13] Given the record on appeal, this Court can as easily determine whether the ecclesiastical abstention doctrine applies to the undisputed facts as the trial court could, and our doing so is in the interest of judicial economy. See Bishop & Diocese of Colo. v. Mote, 716 P.2d 85, 103 (Colo. 1986) (choosing to decide the applicability of the ecclesiastical abstention doctrine rather than remand to the trial court); Episcopal Church in Diocese of Conn. v. Gauss, 28 A.3d 302, 316-17 (Conn. 2011) (resolving the issue on the record rather than remanding to the trial court to do so).

### C. The Ecclesiastical Abstention Doctrine & Church Property Disputes

As already noted, civil courts have general authority to resolve church property disputes and have "an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of property can be determined conclusively." Jones, 443 U.S. at 602. A state may adopt "'*any* one of various approaches for settling church property disputes *so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.*'" Jones, 443 U.S. at 602 (second emphasis added) (quoting Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 368 (1970) (Brennan, J., concurring)). So far, however, only two general approaches for resolving church property disputes have received the Supreme Court's endorsement as constitutionally permissible—the rule of hierarchical deference and the neutral-principles approach. See Jones, 443 U.S. at 604 (endorsing the neutral-principles approach applied by Georgia); Watson, 80 U.S. at 727 (adopting the rule of hierarchical deference); Kedroff, 344 U.S. at 115-16 (explaining that the holding of Watson was required by the

---

[12] Were the facts disputed, a remand would be necessary, because this Court's jurisdiction is appellate only, and "this Court cannot itself find facts." Davis v. Gulf Ins. Grp., 546 S.W.2d 583, 585 (Tenn. 1977).

[13] The trial court correctly noted that the Plaintiffs failed to comply with Rule 56.03 of the Tennessee Rules of Civil Procedure, which requires the moving party to provide "a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial" along with the motion for summary judgment. Tenn. R. Civ. P. 56.03. While we do not sanction this noncompliance, we will not deny summary judgment on this basis because the record clearly establishes that no material facts are in dispute. See Miller v. Wyatt, 457 S.W.3d 405, 412 (Tenn. Ct. App. 2014) (granting summary judgment despite noncompliance with Rule 56.03, where the material facts were not in dispute and established that the moving party was entitled to summary judgment as a matter of law), perm. app. denied (Tenn. Nov. 20, 2014).

First Amendment).  We begin by reviewing the United States Supreme Court decisions that establish the constitutional parameters within which state courts must remain.

### 1. Rule of Hierarchical Deference

The Supreme Court announced the rule of hierarchical deference in <u>Watson v. Jones</u> in 1871.  For 150 years preceding <u>Watson</u>, the English rule, articulated in <u>Craigdallie v. Aikman</u>, 4 Eng. Rep. 435 (1820), had been the dominant approach for resolving such church property disputes.  <u>See</u> Jeffrey B. Hassler, Comment, <u>A Multitude of Sins? Constitutional Standards for Legal Resolution of Church Property Disputes in a Time of Escalating Intradenominational Strife</u>, 35 Pepp. L. Rev. 399, 408 (2008) [hereinafter 35 Pepp. L. Rev. at ___.]; Michael W. McConnell and Luke W. Goodrich, <u>On Resolving Church Property Disputes</u>, 58 Ariz. L. Rev. 307, 311 (2016) [hereinafter 58 Ariz. L. Rev. at __.].  The English rule required courts to determine "the true standard of faith in the church organization," and to ascertain "which of the contending parties before the court h[eld] to this standard."  <u>Watson</u>, 80 U.S. at 727.  Thus, in the absence of express language, the English rule required courts to make an investigation into the doctrinal beliefs of the parties and to imply a trust in favor of the party most closely adhering to the beliefs of the religious organization.  35 Pepp. L. Rev. at 408.

In <u>Watson</u>, the Court declined to adopt the English rule as the law in this country.  <u>Watson</u> involved a pre-Civil War dispute between antislavery and proslavery factions over control of the property of the Walnut Street Presbyterian Church in Louisville, Kentucky.  80 U.S. at 691-93, 727-30.  The antislavery faction had been recognized as the faction entitled to exercise control of the property by the General Assembly—the highest authority of the Presbyterian Church in the United States—the denomination with which the Walnut Street Church was affiliated.  <u>Id.</u> at 691-93.  When the case eventually reached the United States Supreme Court, both factions were claiming "to be the true Walnut Street Presbyterian Church" entitled to the property, and each "den[ied] the right of the other to any such claim."  <u>Watson</u>, 80 U.S. at 717.

The Supreme Court explained why the English rule would not be applied to decide the dispute in <u>Watson</u>, stating:

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all.  *The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.*

<u>Id.</u> at 728 (emphasis added).  Rather, said the <u>Watson</u> Court,

[r]eligious organizations come before [civil courts in this country] in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints.

Id. at 714.

The Supreme Court then categorized religious organizations as either independent congregations or members of a hierarchical church. Id. at 725-26. For independent congregations, the Supreme Court explained, rights of competing factions to the use and possession of church property "must be determined by the ordinary principles which govern voluntary associations." Id. at 725. If an independent congregation agrees to be governed by majority rule, "then the numerical majority of members must control the right to the use of the property." Id. If an independent congregation vests officers with the powers of control, "then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property." Id.

For hierarchical religious organizations, however, the Supreme Court emphasized that it was "bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." Id. at 726-27. The Supreme Court stressed that,

> [t]he right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations and officers within the general association, is unquestioned. *All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.* It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, *that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.*

Watson, 80 U.S. at 729-30 (emphases added). Therefore, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal

tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." Id. at 727.[14]

Applying the rule of hierarchical deference, the Supreme Court in Watson deferred to the determination of the highest judicatory of the Presbyterian Church about which faction was entitled to the possession and control of the property of the Walnut Street Presbyterian Church in Louisville. Id. at 734; see also Hosanna-Tabor, 565 U.S. at 185-86 (describing the holding in Watson). The Supreme Court grounded its decision in Watson on "a broad and sound view of the relations of church and state under our system of laws" rather than the First Amendment Religion Clauses. 80 U.S. at 727. Indeed, Watson preceded the incorporation and application of the First Amendment to the States. But, in a subsequent decision, the Supreme Court described Watson as "radiat[ing]. . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine" and clarified that the principles it announced are required by the First Amendment. Kedroff, 344 U.S. at 115-16.

## 2. Neutral-Principles Approach

For almost a century, the rule of hierarchical deference Watson announced was the only analytical approach to receive the Supreme Court's imprimatur as acceptable under the First Amendment for resolving church property disputes arising in hierarchical religious organizations. 58 Ariz. L. Rev. at 316. In 1969, however, the Supreme Court stated that "neutral principles of law, developed for use in all property disputes" could also be applied constitutionally to resolve church property disputes. Blue Hull, 393 U.S. at 449.

Responding to this statement, the Georgia Supreme Court early on adopted the neutral principles of law approach. See Jones, 443 U.S. at 600. In applying this approach, the Georgia Supreme Court examined deeds to disputed church property, state statutes dealing with implied trusts, and provisions in the constitutions and governing documents of hierarchical religious organizations regarding ownership of church property. Id. at 600-601. In a case where none of the church documents included language of trust in favor of the hierarchical religious organization, the Georgia Supreme Court awarded the disputed property to the local member congregation. Id. at 600 (citing Presbyterian Church v. E. Heights Presbyterian Church, 167 S.E.2d 658, 660 (Ga. 1969)). But, in a case where "the constitution of The United Methodist Church . . . contained an express trust provision in favor of the general church," the Georgia Supreme Court

---

[14] Because there is no dispute here as to the hierarchical organization of COGIC, we need not discuss further the analysis applicable to independent congregations.

awarded the disputed property to the United Methodist Church, not the local member congregation, even though neither the deed to the local property nor state statutes regarding implied trusts contained language of trust in favor of the hierarchical church. Id. at 600-601 (citing Carnes v. Smith, 222 S.E.2d 322, 328 (Ga. 1976)) (footnote omitted).

In its Jones decision, the Georgia Supreme Court had applied the neutral-principles approach and had awarded the disputed property to the local member congregation because the deeds, state statutes regarding implied trusts, the corporate charter of the local church, and the provisions of the constitution of the hierarchical religious organization concerning ownership and control of property all "failed to reveal any language of trust in favor of the general church." Jones, 442 U.S. at 601.

The Supreme Court granted certiorari, and in a five-to-four decision, endorsed Georgia's neutral principles of law approach, "[a]t least in general outline," as consistent with the constitutionally circumscribed role civil courts play in resolving church property disputes. Id. at 602. The Court described the neutral-principles approach as "completely secular in operation" and "flexible enough to accommodate all forms of religious organization and polity." Id. at 603. The neutral-principles approach, said the Jones Court, "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges," and by doing so, "promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." Id. The Supreme Court also lauded the neutral-principles approach for providing religious organizations with "flexibility in ordering private rights and obligations to reflect the intentions of the parties." Id. The Jones Court explained that, "[t]hrough appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy." Id. "In this manner," said the Supreme Court, "a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members." Id. at 603-04.

Despite the advantages of the neutral-principles approach, the Jones Court acknowledged that its application would not be "wholly free of difficulty." Id. at 604.

> The neutral-principles method, at least as it has evolved in Georgia, *requires* a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church

incorporates religious concepts in the provisions relating to the ownership of property. *If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.*

On balance, however, the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application. These problems, in addition, should be gradually eliminated as recognition is given to the obligation of States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions. We therefore hold that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute.

Id. at 604 (emphases added) (internal citations, quotation marks, and alterations omitted).

The dissent in Jones would have rejected the neutral-principles approach and required civil courts resolving property disputes to defer, as a matter of constitutional law, to "the authoritative resolution of the dispute within the church itself." Id. at 614-15 (Powell, J., dissenting) (internal quotation marks omitted). The Jones majority concluded, however, that the First Amendment does not require states "to adopt a rule of compulsory deference to religious authority in resolving church property disputes . . . *where no issue of doctrinal controversy is involved.*" Id. at 605 (emphasis added).

The dissent in Jones also argued that compelling civil courts to defer as a matter of constitutional law would ensure that religious freedom is protected from governmental interference in matters of religious doctrine. Id. at 616-17 (Powell, J., dissenting). The Jones majority disagreed that the neutral-principles approach would allow the government to interfere with religious freedom, explaining:

At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*

Id. at 606 (emphasis added).

Although the Jones Court endorsed the neutral-principles approach, it remanded to the Supreme Court of Georgia to determine whether the neutral-principles approach had been constitutionally applied. Id. at 609-10. The "complicating factor" in Jones was that the schism was among members of a single local congregation, rather than between a local member congregation and a hierarchical religious organization. Id. at 606-07. The Georgia Supreme Court had concluded, "[w]ithout further analysis or elaboration," that "the local congregation was represented by the majority faction." Id. at 601. Before the United States Supreme Court, the minority faction argued that "the question of which faction is the true representative of the [local church] is an ecclesiastical question that cannot be answered by a civil court," at least not "in a case involving a hierarchical church . . . where a duly appointed church commission has determined which of the two factions represents the true congregation." Id. at 607 (internal quotation marks omitted). The Jones Court explained that, under the neutral-principles approach, and consistently with the First Amendment, Georgia could adopt a rebuttable presumption of majority representation as the means to identify the faction entitled to the disputed property. Id. at 607. However, the Court explained,

> any rule of majority representation can always be overcome, under the neutral-principles approach, *either by providing, in the corporate charter or the constitution of the general church, that the identity of the local church is to be established in some other way, or by providing that the church property is held in trust for the general church and those who remain loyal to it.* Indeed, the State may adopt any method of overcoming the majoritarian presumption, so long as the use of that method does not impair free-exercise rights or entangle the civil courts in matters of religious controversy.

Id. at 607-08 (footnote omitted) (emphasis added). The Georgia Supreme Court had failed to adopt explicitly a presumptive rule of majority representation, and statements in some of its decisions indicated that the identity of the faction constituting the local church was to be determined by the laws and regulations of the hierarchical religious organization. Id. at 608. The Jones Court explained that, if Georgia applied a rule requiring the identity of the local faction to be determined according to the laws and regulations of the hierarchical religious organization, "then the First Amendment requires that the Georgia courts give deference to the presbyterial commission's determination of [the local congregation's] identity." See id. at 609. The Jones Court then remanded for the Georgia Supreme Court to determine which method it had adopted under the neutral-principles approach for identifying the local congregation. Id. at 610.

In summary then, under the neutral-principles approach, courts decide church property disputes based on the same neutral principles of law applicable to other entities, while deferring to the decisions of religious entities on ecclesiastical and church polity questions. Jones, 443 U.S. at 603-04; see also Milivojevich, 426 U.S. at 708-09.

*3. Current Approaches Adopted by States for Resolving Church Property Disputes*

The Supreme Court has not rendered a decision involving a church property dispute since <u>Jones</u>.[15]  Although <u>Jones</u> made clear that the First Amendment does not mandate adoption of any particular analysis for resolving church property disputes, so long as the approach adopted "involves no consideration of doctrinal matters," 443 U.S. at 602, state courts have fashioned no other distinct approaches.  Instead, a majority of states now apply the neutral-principles approach, while several states have retained the rule of hierarchical deference, and still other states have not yet decided which approach to adopt.  <u>See</u> 58 Ariz. L. Rev. at 319, n.77 (stating that twenty-nine states have adopted some version of the neutral-principles approach, nine states have retained the rule of hierarchical deference, and twelve states are unclear or undecided, but noting that "[a]ny precise count should be considered with caution, as the law in some states is ambiguous, inconsistent, or in flux" (citing 35 Pepp. L. Rev. at 457)); <u>see also</u> <u>Hope Presbyterian Church of Rogue River v. Presbyterian Church (U.S.A.)</u>, 291 P.3d 711, 721 n.3 (Or. 2012) [hereinafter <u>Rogue River</u>] (stating that a majority of states apply the neutral-principles approach); <u>Masterson v. Diocese of Nw. Tex.</u>, 422 S.W.3d 594, 606-07 n.6 (Tex. 2013) (stating that a majority of states have adopted the neutral-principles approach and citing cases); <u>Heartland Presbytery v. The Presbyterian Church of Stanley, Inc.</u>, 390 P.3d 581, 596 (Kan. Ct. App. 2017) (stating that a majority of states have adopted the neutral-principles approach).  Many hierarchical religious organizations have responded to <u>Jones</u> as well by acting on the Supreme Court's suggestion, <u>see</u> <u>Jones</u>, 443 U.S. at 606, and including in their constitutions and/or other governing documents provisions stating clearly that local member church property is held in trust for the hierarchical religious organization.  58 Ariz. L. Rev. at 320-21; <u>Presbytery of Greater Atlanta, Inc. v. Timberridge Presbyterian Church, Inc.</u>, 719 S.E.2d 446, 458 (Ga. 2011).  Other denominations, such as the United Methodist Church, "require[] 'all written instruments of conveyance' for all church property to state that the property 'shall be kept, maintained, and disposed of for the benefit of the United Methodist Church and subject to the usages and the Discipline of the United Methodist Church.'"  <u>See</u> 58 Ariz. L. Rev. at 342 (quoting <u>The Book of Discipline of the United Methodist Church</u> 649 ¶ 2503(4) (Harriet Jane Olson et al. eds., 2000)).  "Such restrictions have rarely been the subject of litigation in reported cases—most likely because these restrictions make ownership clear." <u>Id.</u>

---

[15]  As already noted, in 2012, the Supreme Court discussed the ministerial exception.  <u>See</u> <u>Hosanna-Tabor</u>, 565 U.S. at 188.  In doing so, the Supreme Court reaffirmed several prior decisions, including <u>Watson</u>.  <u>Hosanna-Tabor</u>, 565 U.S. at 185-87.  The Supreme Court did not mention or refer to <u>Jones</u> in <u>Hosanna-Tabor</u>.

Most litigation has arisen in cases, such as this one, where a hierarchical religious organization includes a provision in its constitution and/or other governing documents providing that local church property is held in trust for the hierarchical organization and a local church fails or declines to include the trust provision in deeds or other documents of conveyance. 58 Ariz. L. Rev. at 340. In such circumstances, "massive inconsistency" exists among states adopting the neutral-principles approach, and courts have reached "different results given the same facts, depending on how the court in question applies the standard." See 35 Pepp. L. Rev. at 426, 431; see also Gauss, 28 A.3d at 316; Rogue River, 291 P.3d at 721-22. From this confusion, two versions of the neutral-principles approach have emerged. One version, applied by a few states, is known as the strict neutral-principles approach, and the other version, applied by a majority of states, is known as the hybrid neutral-principles approach.

### a. Strict Neutral-Principles Approach

Under the strict approach, courts only give effect to provisions in church constitutions and governing documents of hierarchical religious organizations if the provisions appear in civil legal documents or satisfy the civil law requirements and formalities for imposition of a trust. 58 Ariz. L. Rev. at 324-25. Although some commentators favor the strict neutral-principles approach, see id. at 327, 358, so far, only a few states have adopted it, see Presbytery of Ohio Valley, Inc. v. OPC, Inc., 973 N.E.2d 1099, 1107 n.7 (Ind. 2012); All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of S.C., 685 S.E.2d 163, 174 (S.C. 2009); Masterson, 422 S.W.3d at 611-12.

### b. Hybrid Neutral-Principles Approach

Most states apply the hybrid approach. See 58 Ariz. L. Rev. at 322. Under this approach, courts defer to and enforce trust language contained in the constitutions and governing documents of hierarchical religious organizations, even if this language of trust is not included in a civil legal document and does not satisfy the formalities that the civil law normally requires to create a trust. Id.; see, e.g. St. Paul Church, Inc. v. Bd. of Trs. of Alaska Missionary Conference of United Methodist Church, Inc., 145 P.3d 541, 554-55 (Alaska 2006) (applying the hybrid neutral-principles approach and concluding that a trust in favor of the United Methodist Church existed based on the trust provision in The Book of Discipline, even though the local church had failed to include the trust language in the deed of conveyance); Gauss, 28 A.3d at 319 (finding trust in favor of hierarchical religious organization based on language in church constitution); Timberridge Presbyterian Church, Inc., 719 S.E.2d at 458 (describing the hybrid neutral-principles approach approved in Jones as involving the consideration of the local and hierarchical church documents regarding property ownership); Episcopal Diocese of Rochester v. Harnish, 899 N.E.2d 920, 924-25 (N.Y. 2008) (finding express trust provision in the hierarchical church constitution dispositive in favor of the hierarchical church, even

though deeds, certificate of incorporation, and state law contained no language supporting creation of such a trust). Courts applying the hybrid approach emphasize that member congregations voluntarily join hierarchical religious organizations, and that, by doing so, agree to be bound by the constitution and rules of those organizations. See In re Episcopal Church Cases, 198 P.3d 66, 81-82, 84 (Cal. 2009) (ruling in favor of hierarchical church after examining deeds, local church's corporate documents, state statutes governing religious property, and denomination church constitution, giving particular weight to the fact that the local church "agreed from the beginning of its existence to be part of a greater denomination church and to be bound by that greater church's governing instruments").

Neither version of the neutral-principles approach dispenses entirely with the principle of hierarchical deference, however. As the Supreme Court explained in Jones, civil courts applying the neutral-principles approach still must "defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." 443 U.S. at 602. In this respect, Jones is entirely consistent with Watson.

*4. Tennessee's Approach to Resolving Church Property Disputes*

Like the United States Supreme Court, this Court has not addressed a church property dispute since Jones. However, in another context—an appeal involving breach of fiduciary duty and negligent hiring, supervision, and retention claims against the Catholic Bishop for the Diocese of Memphis—this Court has stated that the neutral-principles approach applies "[w]ith regard to external affairs of religious institutions." Redwing, 363 S.W.3d at 449.

Moreover, the Court of Appeals expressly adopted the neutral-principles approach in an appeal involving a church property dispute four years before the United States Supreme Court decided Jones. See Fairmount Presbyterian Church, Inc. v. Presbytery of Holston of the Presbyterian Church of U.S., 531 S.W.2d 301, 306 (Tenn. Ct. App. 1975) (adopting the neutral-principles approach). In doing so, the Court of Appeals–like the Georgia Supreme Court–relied on the Supreme Court's 1969 decision stating that such claims could be resolved by applying neutral principles of law. Id. at 304 (discussing Blue Hull, 393 U.S. 440). Applying the neutral-principles approach, the Court of Appeals held that an implied trust arose in favor of the hierarchical religious organization because the local church had been chartered to be a member of the hierarchical religious organization. Id. at 305-06. The Court of Appeals did not use the terms hybrid or strict in Fairmount, or any subsequent case, when describing the neutral-principles approach it adopted. But in Fairmount, and in prior and subsequent decisions, the Court of Appeals has stated that when property is conveyed to a local church that is part of a hierarchical religious organization, the property is held in trust for the hierarchical religious organization, even when no trust language is included in the deed of conveyance. See, e.g., St. Andrew's, 2012 WL 1454846, at *20; Church of God In Christ, Inc. v. Middle

City Church of God In Christ, 774 S.W.2d 950, 952 (Tenn. Ct. App. 1989); The Cumberland Presbyterian Church v. N. Red Bank Cumberland Presbyterian Church, 430 S.W.2d 879, 882 (Tenn. Ct. App. 1968); Hardin v. Starnes, 221 S.W.2d 824, 828 (Tenn. Ct. App. 1949).

The Court of Appeals most recently applied the neutral-principles approach in Saint Andrew's. In that case, "[a]n Episcopal parish in Nashville asserted its intention to disassociate from the Diocese of Tennessee, resulting in the Diocese to file a declaratory judgment action to determine whether the Diocese or the local congregation owned and controlled the real and personal property where the local congregation worshiped." 2012 WL 1454846, at *1. The trial court ruled that the Episcopal Church is a hierarchical religious organization and concluded that the local parish held its real property in trust for the Diocese. Id. The local parish appealed, arguing that the trial court lacked subject matter jurisdiction based on the ecclesiastical abstention doctrine. Id. at *6. The Court of Appeals rejected this argument, explaining, correctly, that the ecclesiastical abstention doctrine only precludes civil courts from exercising jurisdiction over "issues of canon law, religious doctrine, or *church governance*." Id. at *7 (citing Milivojevich, 426 U.S. at 710). The Court of Appeals emphasized that the ecclesiastical abstention doctrine does not preclude a court from examining "*religious documents such as a church constitution for language of a trust*" in order to apply the neutral-principles approach and resolve a church property dispute. Id. at *8 (citing Jones, 443 U.S. at 604) (emphasis in original). After examining the governing documents of the Episcopal Church, the Court of Appeals affirmed the trial court, explaining that the Episcopal Church's governing documents clearly established that all real property owned by local parishes was held in trust for the Episcopal Church. Id. at *20.

Having reviewed prior Tennessee decisions, as well as the relevant precedent from the Supreme Court and other jurisdictions, we agree with the Court of Appeals that courts in Tennessee should apply the neutral-principles of law approach when called upon to resolve church property disputes. We also conclude that the hybrid approach is most consistent with the analysis the Supreme Court reviewed and approved as constitutionally permissible in Jones and also most consistent with the analysis courts in this State have previously used when resolving church property disputes. In applying the hybrid approach, Tennessee courts may consider any relevant statutes, the language of the deeds and any other documents of conveyance, charters and articles of incorporation, and any provisions regarding property ownership that may be included in the local or hierarchical church constitutions or governing documents. But under the neutral-principles approach that Jones approved as constitutionally permissible, and which we adopt, a civil court must enforce a trust in favor of the hierarchical church, even if the trust language appears only in the constitution or governing documents of the hierarchical religious organization. See Jones, 443 U.S. at 606. This understanding of the contours of the neutral-principles approach derives from the discussion in Jones of the two options available to hierarchical religious organizations for ensuring that real property owned by local member churches is

held in trust for the hierarchical organization. Id. The Supreme Court stated that deeds or corporate charters may be modified "at any time before [a property] dispute erupts . . . to include a right of reversion or trust in favor of the general church." Id. "Alternatively," the Supreme Court explained, "the constitution of the general church can be made to recite an express trust in favor of the denominational church." Id. The Court described the burden required to take these steps as "minimal" and declared that civil courts would "be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." Id. Read in context, this passage from Jones contemplates two methods of establishing a trust in favor of the hierarchical religious organization—one involving modification of civil legal documents and one involving modification of the governing documents of hierarchical religious organizations. Where a religious organization chooses the second option and includes an express trust provision in its constitution or governing documents before a dispute arises, courts in Tennessee must enforce and give effect to the trust provision, even if trust language does not appear in a deed or other civil legal document.[16] By doing so, the neutral-principles approach will provide both hierarchical religious organizations and local member congregations the flexibility and predictability that Jones envisioned, allowing these organizations to decide for themselves how property disputes will be resolved *before a dispute arises*, thus avoiding contentious, painful, time consuming, and expensive litigation and minimizing the role of civil courts. See Jones, 443 U.S. at 603-04.

### 5. Application of the Hybrid Neutral-Principles Approach

Having clarified the governing analysis, we now consider whether the Court of Appeals erred by affirming the trial court's dismissal of this lawsuit. We begin with the Court of Appeals' conclusion that because Temple COGIC had not formally withdrawn from COGIC, this appeal involves only an ecclesiastical question rather than a dispute over church property. We have found no support for this proposition in the decisions of the United States Supreme Court or this Court.[17] Indeed, Jones, the seminal decision on

---

[16] We note that both this Court and the Court of Appeals have declined to impose trusts in favor of hierarchical religious organizations where deeds conveying disputed property include language clearly vesting control of the disputed property in the local churches, rather than the hierarchical religious organization, and where no language of trust appeared in documents of the hierarchical church. See, e.g., Ward v. Crisp, 226 S.W.2d 273, 275-76 (Tenn. 1949); Emmanuel Churches of Christ v. Foster, No. M2000-00812-COA-R3-CV, 2001 WL 327910, at *3 (Tenn. Ct. App. Apr. 5, 2001). That fact scenario is not presented in this appeal.

[17] The only support the Court of Appeals provided for its determination that withdrawal was a condition precedent to a court's exercise of jurisdiction was language used in a prior Court of Appeals' opinion to state the issue presented in that case. See Church of God in Christ, Inc., 2016 WL 325499, at *7 (quoting the issue statement from Saint Andrew's, 2012 WL 1454846, at *13).

the neutral-principles approach, refutes it. As already explained, Jones involved a property dispute among factions of the congregation of a member church—a dispute quite similar to this appeal. Jones, 443 U.S. 595. The first question the Supreme Court answered in Jones was whether the hierarchical church held the property in trust, and the second question posed but remanded to the Georgia Supreme Court to answer, was which faction represented the local member church that was entitled to the control and use of the property the hierarchical church held in trust. Id. at 608-09. As to this second question, the Supreme Court explained that, if a state chooses to identify the local member church by reference to the governing doctrine of the hierarchical church, then the state must defer to any binding determination made by an appropriate authority of the hierarchical church as to the identity of the local member church. Jones, 443 U.S. at 609-10. Nowhere did the Supreme Court in Jones indicate that the property dispute was beyond the power of civil courts to resolve simply because the local member church had not formally withdrawn from the hierarchical church. We likewise decline to impose such a constraint. As already noted, states have an "interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of property can be determined conclusively." Jones, 443 U.S. at 602. Therefore, we reject the Court of Appeals' holding that a local member church must formally withdraw from a hierarchical religious organization before a civil court may exercise jurisdiction over a church property dispute.[18] Parties seeking to invoke the jurisdiction of a civil court must simply allege facts establishing that a church property dispute actually exists.

---

[18] The Court of Appeals in this case relied upon an earlier decision involving COGIC as a basis for declining to resolve the property dispute in this appeal. In the prior case, the Court of Appeals also declined to rule, citing the ecclesiastical abstention doctrine. See Church of God in Christ, Inc., 774 S.W.2d at 952. But in that prior case COGIC was not seeking possession of the property, had not alleged that the member church was seeking to withdraw from COGIC, and had not alleged that the congregation of the member church was split. COGIC sought only a judicial determination that the member church held its property in trust for COGIC. Id. Under those circumstances, the Court of Appeals properly declined to rule on the case but should have based its ruling on the ground that the lawsuit was not justiciable, rather than relying on the ecclesiastical abstention doctrine. To be justiciable "*a real question rather than a theoretical one must be presented* and a legally protectable interest must be at stake." West v. Schofield, 460 S.W.3d 113, 130 (Tenn. 2015) (citing Cummings v. Beeler, 223 S.W.2d 913, 915 (Tenn. 1949)) (emphasis in original). If a controversy involves only a "*theoretical or hypothetical state of facts, the controversy is not justiciable.*" Id. (citing Story v. Walker, 404 S.W.2d 803, 804 (Tenn. 1966)) (emphasis in original). Were the rule otherwise, "the 'courts might well be projected into the limitless field of advisory opinions.'" Id. (quoting Story, 404 S.W.2d at 804). The prior appeal clearly involved only a theoretical question and not a property dispute. Indeed, the Court of Appeals in the earlier case implicitly recognized as much when it commented that "future adjudication may be necessary" "[s]hould the local congregation withdraw or should there b[e] a true impasse relating to property rights." Church of God in Christ, Inc., 774 S.W.2d at 953. Unlike the earlier lawsuit, the facts of this case overwhelmingly establish the existence of a church property dispute.

Here, the allegations of the second amended complaint clearly—indeed overwhelmingly—establish the existence of a church property dispute. The second amended complaint alleges that Bishop Hall, the duly appointed pastor of Temple COGIC, was barred from entering the facility and was threatened with arrest by a law enforcement officer should he remain on the premises. Additionally, persons purportedly acting as trustees for Temple COGIC executed a quit claim deed conveying the property to the Moscow Church, an entity not affiliated with COGIC. Thus, a property dispute clearly exists requiring a civil court to determine whether Temple COGIC property was held in trust for COGIC. As in Jones, the deed to the disputed property does not include language creating a trust in favor of COGIC. Rather, the property was conveyed to the trustees of Temple COGIC. Nevertheless, and also like Jones, the governing documents of the hierarchical church, here COGIC, includes a provision indicating that real property of local member churches "is held in trust for the use and benefit of the members of the Church of God in Christ with National Headquarters in the City of Memphis, Shelby County, Tennessee, and subject to the Charter, Constitution, Laws and Doctrines of said Church, now in full force and effect, or as they may be hereafter amended, changed or modifie[d]." This language appears not once but twice in the governing documents of COGIC. Temple COGIC agreed to be bound by COGIC's constitution and governing documents when it joined COGIC and received a COGIC membership certificate. Additionally, for many years before this dispute arose, Temple COGIC demonstrated its intent to be bound by COGIC's constitution and laws by recognizing the authority of Ecclesiastical Bishops and Pastors who were appointed pursuant to COGIC's constitution and laws. Accordingly, applying the hybrid neutral-principles approach, we conclude that Temple COGIC's real property was held in trust for COGIC.

As in Jones, the second question that must be answered in this appeal is which faction of Temple COGIC constitutes the faction entitled to the possession and use of the property that is held in trust for COGIC. The Defendants argue that this is an ecclesiastical question beyond the jurisdiction of civil courts to decide because it requires a determination of whether Bishop Hall is the duly appointed pastor of Temple COGIC. The Plaintiffs agree that whether Bishop Hall is the duly appointed pastor of Temple COGIC is an ecclesiastical question that civil courts may not answer. However, the Plaintiffs point out that this question has already been resolved by the Ecclesiastical Council's judgment and that civil courts need only defer to this binding and final judgment of the Ecclesiastical Council when resolving the underlying church property dispute. We agree with the Plaintiffs.

Again, Jones teaches that a court may constitutionally apply the neutral-principles approach to resolve a property dispute so long as the civil court avoids deciding ecclesiastical matters and defers to the resolution of issues of religious doctrine or polity by the highest court of the hierarchical church. Jones, 443 U.S. at 602. An Ecclesiastical Council of COGIC has determined that Bishop Hall was at all times relevant to this appeal the duly appointed pastor of Temple COGIC. Our role is simply to defer to this

determination in resolving this appeal.  <u>Id.</u>; <u>see also</u> <u>Hosanna-Tabor</u>, 565 U.S. at 185 ("Our decisions in that area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers.").  It is undisputed that, as the duly appointed pastor of Temple COGIC, Bishop Hall had the right to use and exercise control over the real property and to administer and supervise the personal property of Temple COGIC.

In light of our conclusion that Temple COGIC held its real property in trust for COGIC and the Ecclesiastical Council's determination, to which we must defer, that Bishop Hall was the duly appointed pastor of Temple COGIC, we conclude that the Plaintiffs are entitled to summary judgment on their claims regarding the real and personal property of Temple COGIC.  Nevertheless, we remand this matter to the trial court for entry of summary judgment in favor of the Plaintiffs and for any further proceedings and orders that may be necessary to afford the Plaintiffs possession and control of Temple COGIC's real property, including an order invalidating the quit claim deed, if necessary, and any further proceedings that may be necessary to address and resolve the Plaintiffs' request for an accounting and control of Temple COGIC's personal property.

### III.  Conclusion

For the reasons stated herein, the judgments of the trial court and the Court of Appeals are reversed.  The Plaintiffs' motion for summary judgment is granted.  This matter is remanded to the trial court for any further proceedings and orders that may be necessary to fashion appropriate remedies to afford the Plaintiffs the relief to which they are entitled under this decision.  Costs of this appeal are taxed to the Defendants, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE